EDWARD I. NAGOURNEY AND LOUISE P. NAGOURNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nagourney v. Commissioner
Docket No. 12771-86
United States Tax Court
T.C. Memo 1989-339; 1989 Tax Ct. Memo LEXIS 335; 57 T.C.M. (CCH) 954; T.C.M. (RIA) 89339; July 17, 1989; As corrected July 19, 1989 Thomas R. Franz, for the petitioners. Richard F. Stein, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a $ 140,161 deficiency in petitioners' 1983 Federal income tax. The issue for our decision is whether receipt of a $ 275,000 cash payment and an automobile valued at $ 12,735 were damages received on account of personal injuries and, thus, excludible from petitioners' gross income under section 104(a)(2). [1]
FINDINGS *336 OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Virginia Beach, Virginia. All references to petitioner will be to Edward I. Nagourney. Petitioner has spent most of his working life in department store management. He first spent 5 or 6 years at the Hecht Company in Washington, D.C. Then he spent 7 years each with department stores in Wisconsin and California. From 1974 until his resignation on August 31, 1982, he was president of Rices-Nachman (Rices), a retail department store in the Tidewater area of Virginia. During his last 3 years at Rices he had an annual income in excess of $ 100,000 and various stock options. Just before he left Rices he had been approached by Phillips-Van Heusen Corporation (Van Heusen), Rice's parent corporation, about moving to New York and heading Van Heusen's retail group. Petitioner declined the offer. On August 31, 1982, at age 52, petitioner entered into an employment agreement with Farm Fresh, Inc. (the corporation), a retail grocery chain with stores primarily located in the Tidewater *337 area of Virginia. The corporation decided to hire petitioner because his department store experience meshed well with its expansion into super combination stores, stores which sold both food and non-food products. Petitioner was to be the corporation's executive vice president and director of marketing, with an initial term of employment commencing on September 1, 1982 and ending on August 31, 1985. Subsequent employment was to be at the sole discretion of the board of directors. Petitioner's salary was to be $ 125,000 during his first year of employment and at least $ 125,000 (with a greater salary at the discretion of the board) during each of the remaining 2 years of his term of employment. The employment agreement contained certain provisions relating to incentive stock options and convertible debentures. Pursuant to these provisions, on September 24, 1982, petitioner was granted an option to purchase the corporation's common stock. The option had to be exercised within 10 years of the date of its grant but could not be exercised before August 31, 1985, except under certain circumstances not relevant here. Also on September 24, 1982, petitioner issued a promissory note to *338 the corporation and in return received a convertible debenture. Petitioner had the option of converting the debenture into common stock at any time after August 31, 1985. In September 1983, the stock subject to petitioner's option and convertible debenture was worth approximately $ 3,750,000, and petitioner's cost of acquiring this stock would have been approximately $ 468,000. If petitioner's employment were terminated by the corporation prior to the date on which he could convert the debenture, the corporation had the option to redeem the debenture for the amount paid for it by petitioner. If petitioner's employment were terminated before August 31, 1985, and before the conversion of the debenture and the exercise of the stock option, petitioner would be paid a termination bonus calculated on the value of the corporation's stock. After receiving the bonus, petitioner would not be able to exercise the stock option or convert the debenture. On April 5, 1983, the corporation completed an initial public offering of its stock. At the time that petitioner was hired, the possibility of going public had been discussed, but no definite plans had been made. It had been intended that *339 petitioner would acquire responsibility for the corporation's non-food operations from the president, Eugene Walters (Walters). However, rather than shifting responsibility to petitioner as expected, Walters largely continued to run the non-food operations and excluded petitioner from corporate affairs. As a result, petitioner sought advice from a friend who was a psychiatrist on ways to be accepted into the corporation. Petitioner also gained 40 pounds. In the summer of 1983, David Furman (Furman), the chairman of the board, told petitioner that Walters wanted petitioner to leave the corporation. On September 23, 1983, petitioner and the corporation executed an Employment Termination and Release Agreement (termination agreement). This agreement terminated petitioner's employment on September 16, 1983. In addition, it extinguished the rights and liabilities of petitioner and the corporation under the employment agreement and released the corporation "from any claim, cause of action, charge, known or unknown by [petitioner], other than the Corporation's obligation hereunder, that [petitioner] may have against the Corporation." The termination agreement stated that petitioner *340 "believes that he has certain claims against the Corporation arising out of the Employment Contract, his termination of employment by [the corporation], and otherwise. The Corporation, however, disputes such claims." The termination agreement provided that petitioner would be paid $ 150,000 "with respect to his bonus upon termination and other compensation under the Employment Contract." The actual amount of the termination bonus calculated under the employment agreement was $ 150,625. The termination agreement also provided for payment of an additional $ 275,000 and transfer of title to a 1983 Buick Park Avenue (valued at $ 12,735). The termination agreement stated that the corporation "has advised [petitioner] that it intends to treat all payments made hereunder 'wages'as for purposes of any withholding obligation the Corporation may have in order to avoid any penalties and interest which might otherwise accrue." The agreement also said that petitioner "has advised the Corporation that he disagrees with such treatment and intends to treat a substantial portion of the payment as non-taxable for income tax purposes. Nevertheless, in order to facilitate this Agreement, [petitioner] *341 consents to the Corporation withholding from the payments hereunder and paying over to the applicable state or federal agencies, [certain amounts] * * *." Before his termination, petitioner enjoyed an excellent reputation in the community, both as a community leader and as a business leader. His termination injured his professional reputation in the business community. Following his termination, petitioner was dropped from the boards of the various community activities in which he had been active. Petitioner now runs his own apparel business, which has done poorly. OPINION The only issue for our decision is whether the $ 287,735 in payments, consisting of the $ 275,000 cash payment and the $ 12,735 automobile, are excludible from gross income under section 104(a)(2). Section 104(a)(2) provides that gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness * * *." Personal injury includes injury to professional reputation as well as damage to personal reputation. Threlkeld v. Commissioner, 87 T.C. 1294, 1298 (1986), affd. *342 848 F.2d 81 (6th Cir. 1988). The term "damages received (whether by suit or agreement)" means "an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs.
There is no doubt that petitioner's professional reputation was hurt when his employment was terminated and, thus, that he suffered personal injury within the meaning of section 104(a)(2). Threlkeld v. Commissioner , supra at 1298. However, it also is clear that petitioner suffered a sizable economic loss when his employment was terminated. He lost both his $ 125,000 yearly salary over the remainder of his employment term and the right to acquire stock with a value of $ 3,750,000 for a payment of $ 468,000. Petitioner bears the burden of showing that the $ 287,735 in payments were made on account of his personal injuries rather than on account of this economic loss. Rule 142(a). Petitioner offers little evidence to carry his burden of proof. He refers to certain testimony by Alan K. Little, who was the corporation's director of fiscal *343 accounting, but this testimony merely explains the calculation of the $ 150,000 termination bonus. Petitioner also refers to certain testimony by Furman, the most relevant portion of which involved direct examination by petitioner's attorney -- Q And was it the company's position and your attorney's position that * * * [the termination bonus] was all he was entitled to under the contract? A Yes. * * * Q Will you state to the Court what your reasons were for paying the $ 275,000 and the automobile * * *? A Well, the reason would be is -- above his contract for his, basically, I would say it's damages caused by him being terminated. * * * Q In meetings with you and his attorney, did Mr. Nagourney threaten * * * [the corporation] with a lawsuit for claims for injury * * * [to] his reputation in the event that some settlement was not worked out satisfactorily between Mr. Nagourney and * * * [the corporation]? A Well, I don't exactly remember. I do remember negotiating a contract but I don't remember about a threat of suing, particularly. I've heard that was mentioned, yes. That was mentioned. But actually as a threat, I don't recall it as a threat because we *344 met and settled. I think he wanted somewhere around 350 over contract and we settled for 275 plus the car. But I don't * * * [think] I'd call it exactly a threat. Q It was discussed, though, wasn't it? A Right. Furman also testified that he handled the negotiations for the amount of the termination payments at a single brief meeting at which only he and petitioner were present. Furman left all other details to the corporate attorney and had no further involvement except to attend a board meeting at which the agreement was ratified. When determining whether a payment is made on account of personal injury, the most important factor to be considered under section 104(a)(2), other than the express language of a settlement agreement, is the intent of the payor. Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987). In the instant case, the settlement agreement did not allocate the amount of the payments, and the only direct evidence of the payor's (the corporation's) intent is Furman's testimony. His testimony was vague and inconclusive. It indicates that he understood that there was a possibility of a lawsuit, but *345 we cannot conclude from it that the corporation intended to make the $ 287,735 in payments on account of personal injury. Petitioner testified that he and his attorney met with the corporation attorney -- A I went to Washington, D.C. -- I can't remember who asked me to go there; I think it was Mr. Walters. I heard Mr. Furman earlier say that he wasn't aware that Mr. Freedman was a part of that. I went to Washington, D.C. with my counsel and we met with Mr. Walter Freedman who is the corporate * * * counsel. And at that meeting I told him I had no alternative. If that was what I was going to get I was going to have to sue. * * * I'm winding up seeing a psychiatrist -- I'm nervous as hell. I gain a tremendous amount of weight. I realize I'm 52-53 years old and I'm not wanted in the job market. I'm bad products -- you know, I'm bad chattel. I'm no good any more. Locally, I'm destroyed. * * * * * * Q And were those reasons made known to either [Furman] or to his attorneys to the best of your recollection? A Certainly. We went over in detail with Walter Freedman [the corporation's attorney] what was going on. We probably had the same conversation with him *346 when we were up there. This testimony suggests that petitioner told the corporate attorney that he believed he had certain claims relating to personal injuries. However, it does not establish that the payments were made on account of personal injuries. Petitioner also notes that Furman testified that the $ 150,000 termination bonus was all that petitioner was entitled to under the contract, and that the additional $ 287,735 in payments were above the corporation's contractual obligation. Petitioner further points out that the termination agreement said that the corporation would make the $ 150,000 payment "with respect to his bonus upon termination and other compensation under the Employment Contract." Accordingly, petitioner argues that the payments must have been compensation for personal injuries. We note that the corporation might have had contractual liability for its apparent breach of its obligation to employ petitioner for 3 years, with resultant economic loss of salary and stock options. In any event, the payments were part of an overall settlement which made no allocation to personal injury or otherwise indicated the payor's intention to make such an allocation. *347 Even petitioner's own testimony is of little help to him. For example, petitioner refers to injury to his reputation and says that "I'm winding up seeing a psychiatrist -- I'm nervous as hell. I gain a tremendous amount of weight." Despite this reference to personal injury, petitioner seems primarily concerned with the economic loss he suffered. For example, he says "my reputation around the country was ruined," and then comments on the economic problems that resulted from that injury. In addition, even if petitioner believed that the corporation made the payments on account of personal injuries, "his belief was only evidence of the character of the payment; the ultimate inquiry is into the 'basic reason' for the company's payment." Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961), affg. a Memorandum Opinion of this Court. The excludability of payments received under a settlement agreement depends on the nature, and not the validity, of the claim which was the actual basis for settlement. Bent v. Commissioner, 87 T.C. at 244. Nevertheless, the validity of petitioner's personal injury claims is relevant to our inquiry because the corporation *348 would have been unlikely to make payments on account of personal injuries unless it perceived that such claims had some validity. Petitioner argues that he had two types of claims. First, he asserts that he would have been entitled to recover damages for personal injuries as a result of fraudulent misrepresentation. Petitioner reasons that, although he was told he would be retained for at least the full term of his employment contract, Walters actually intended to fire him once his credentials had been used to increase the attractiveness of the initial public offering of the corporation's stock. The record does not support this theory. Second, petitioner argues that he would have been entitled to recover damages for intentional infliction of emotional distress. We can find nothing in the record to support this theory either. Finally, we note that the corporation withheld taxes on the payments. Such withholding by a payor is a "significant, although not dispositive" factor. McKim v. Commissioner, T.C. Memo. 1980-93. We conclude that the entire $ 287,735 in payments were made as compensation for economic loss, not personal injury. Accordingly, none of the *349 payments are excludible from gross income under section 104(a)(2). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩