Andrew PIPITONE and Joanne Pipitone, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 98–3624.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1999.

Decided June 14, 1999.

Andrew Pipitone (argued), Chicago, IL, Plaintiff–Appellant Pro Se.

Joanne Pipitone, Chicago, IL, Plaintiff–Appellant Pro Se.

Bruce R. Ellisen (argued), Donald J. Tobin, Department of Justice, Tax Division, Appellate Section, Washington, DC, for Defendant–Appellee.

Before WOOD, JR., RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Andrew and Joanne Pipitone filed suit for a refund from a federal income tax payment in the amount of $32,511 for the 1995 taxable year. This amount was paid as part of a $95,000 payment Andrew Pipitone ("Pipitone") received from his employer, CNA Insurance Companies ("CNA"), at the time of the termination of his employment. The district court granted the government's motion for summary judgment, concluding that Pipitone failed to introduce any evidence to support his claim for a tax refund. Because we agree that summary judgment was properly entered in favor of the government, we affirm.

## I. HISTORY

Andrew Pipitone worked in the claims department of CNA from December 1981 until the termination of his employment on January 13, 1995. At that time, Pipitone was forty-nine years old, and he states that his job title was "Director of Strategic Claims."

As part of the termination of his employment, CNA and Pipitone entered into an agreement entitled "General Release in Full and Settlement Agreement" ("Settlement Agreement"), which is largely reproduced in the district court's opinion. *See Pipitone v. United States*, 17 F.Supp.2d 793, 794 (N.D.Ill.1998). Pursuant to the terms of the Settlement Agreement, CNA agreed to pay Pipitone the equivalent of fifty-two weeks salary in the amount of $95,000 less applicable federal, state, and local deductions, and to provide Pipitone with outplacement services and continued coverage under the company's health plan. For his part, Pipitone agreed to release and discharge any right to other severance or benefits and any claims under the Age Discrimination in Employment Act of 1967 ("ADEA") he may have had against CNA. Pipitone additionally agreed to forego any

other legal action against CNA. The Settlement Agreement also contained an integration clause and a complete disclaimer of liability on the part of CNA, which stated: "It is agreed and understood that the Company denies the existence of any liability to you and that the instant Agreement is intended solely to accomplish a settlement and is not to be construed as an admission of fault or liability of any kind or nature on the part of the Company."

Although Pipitone reported the $95,000 payment as income on his 1995 income tax Form 1040 and paid the required tax on this amount, he filed an amended tax return Form 1040X in August 1996. In his amended return, Pipitone excluded as income the $95,000 he received from CNA and sought a refund of the $32,511 in taxes he paid on this amount. Pipitone claimed that this amount was properly excludible under 26 U.S.C. § 104(a)(2), because it constituted a payment made in consideration for his release of any claims he might have had against CNA for age discrimination and other potential tort claims.

The Internal Revenue Service ("IRS") rejected Pipitone's claim for a tax refund, concluding that under the Supreme Court's decision in *Commissioner v. Schleier*, 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), "back pay and liquidated damages recovered through the settlement of a claim under the age discrimination in employment act are not excludible from gross income." After the IRS rejected his written appeal, Pipitone filed suit in district court. The district court granted the government's motion for summary judgment based on its conclusion that Pipitone failed to introduce any evidence supporting his argument that he received the payment from CNA as part of a settlement agreement for personal injuries arising from his claims of age discrimination, slander, and libel, and, therefore, the payment was properly excludible from income under § 104(a)(2).

## II. ANALYSIS

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *See Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 629 (7th Cir.1993); *Hefti v. Internal Revenue Serv.*, 8 F.3d 1169, 1171 (7th Cir.1993). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Hefti*, 8 F.3d at 1171. "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994).

### B. Pipitone's Claim for a Tax Refund

This case involves the interplay between two sections of the Internal Revenue Code governing exclusions from gross income—§ 61(a) and § 104(a)(2). Section 61(a) of the Internal Revenue Code states that, except as otherwise provided, "gross income means all income from whatever source derived...." 26 U.S.C. § 61(a). The Supreme Court has repeatedly recognized the broad scope of this section and the liberal construction it is to be afforded "in recognition of the intention of Congress to tax all gains except those specifically exempted." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430, 75 S.Ct. 473, 99 L.Ed. 483 (1955). In contrast to the liberal construction afforded to § 61(a), exclusions from income are narrowly con-

strued. See *Schleier,* 515 U.S. at 328, 115 S.Ct. 2159; *Commissioner v. Jacobson,* 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949). In essence, all accessions to wealth are taxable unless the taxpayer demonstrates that the gain at issue fits within a particular statutory exclusion from income. *See Downey v. Commissioner,* 33 F.3d 836, 837 (7th Cir.1994). And, in a tax refund suit, the taxpayer bears the burden of proving the amount he is entitled to recover. *See United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

Section 104(a)(2) excludes from income any "damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." 26 U.S.C. § 104(a)(2). The term "damages received" is defined by Treasury Regulation 1.104–1(c) as "an amount received ... through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Treas. Reg. § 1.104–1(c).

■ As clarified by the Supreme Court in *Schleier,* an amount received may be excluded from gross income only when it is received both (1) through the prosecution of an action or the settlement entered into in lieu of prosecution of an action based upon tort or tort-type rights and (2) on account of personal injuries or sickness. 515 U.S. at 337, 115 S.Ct. 2159; *see also United States v. Benson,* 67 F.3d 641, 645 (7th Cir.1995). In cases in which damages are received pursuant to a written settlement agreement, the focus is on the origin and characteristics of the claims settled in determining whether such damages are excludible under § 104(a)(2). *See United States v. Burke,* 504 U.S. 229, 237, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). For purposes of § 104(a)(2), we look to state law in determining the nature of the claim. *See Burnet v. Harmel,* 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199 (1932) ("The state law creates legal interests, but the

federal statute determines when and how they shall be taxed.").

■ The first requirement under *Schleier* is the existence of a claim based upon tort or tort-type rights. 515 U.S. at 337, 115 S.Ct. 2159. The claim must be bona fide, but not necessarily valid or sustainable. *See Taggi v. United States,* 35 F.3d 93, 96 (2d Cir.1994). Claims for potential future personal injuries do not qualify for exclusion under § 104(a)(2); by implication, there must be an existing claim. *See Lubart v. Commissioner,* 154 F.3d 539, 542 (5th Cir.1998) ("In order to prevent ... contrived settlements, the courts must require the presence of an actual dispute. If section 104(a)(2) were construed to encompass releases of potential unspecified future claims, ... manufacturing section 104(a)(2) tax treatment would be simple.").

Pipitone contends that his tort or tort-type claims stemmed from CNA's engagement "in a course of conduct that wrongfully and illegally subjected him to a great deal of harassment and humiliation." Specifically, Pipitone's claims arose from a poor performance appraisal and subsequent transfer from the Claims Department where he had worked for a period of twelve years. He states that "[t]his conduct caused [him] embarrassment and to become physically and emotionally injured as well as damage to his personal reputation by the false statements made and published in a performance review." Pipitone contends that he discussed these issues with CNA.

Pipitone argues that the $95,000 he received from CNA pursuant to the Settlement Agreement upon the termination of his employment represents CNA's payments to him as a result of his bona fide claims for personal injuries arising from age discrimination under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/101 *et seq.,* and slander and libel under Illinois law. It is axiomatic that slander and libel are claims sounding in tort, and Illinois courts have construed the Illinois Human

Rights Act ("IHRA") as encompassing claims for tort-type damages as well. *See, e.g., Pavilon v. Kaferly*, 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245, 1249 (1990) ("Where the elements of the tort require proof of nothing more than that proscribed by the [Illinois Human Rights] Act, and where the tort merely furthers the same policies as the statute, the IHRA . . . will preempt the tort action.") (citation omitted); *Arlington Park Race Track Corp. v. Human Rights Com'n*, 199 Ill. App.3d 698, 145 Ill.Dec. 747, 557 N.E.2d 517, 524 (1990) (rejecting the argument that damages for mental distress, embarrassment, and emotional injury are not compensable under the Illinois Human Rights Act).

The fact that Pipitone did not file a formal suit alleging these claims against CNA is not necessarily detrimental to his efforts to establish the existence of an underlying tort-type cause of action. However, "the absence of any knowledge of the claim on the part of the employer-payor obviously has a negative impact in determining the requisite intent of the payment." *Keel v. Commissioner*, 73 T.C.M. (CCH) 3092, 3095 (1997). Before the district court, Pipitone submitted a declaration supporting his claim that CNA was aware of his claims. This declaration provides that "[o]n or around December 7, 1994, in his office, in conversation with [Senior Vice–President of CNA's Claim Department] Thomas Donnelly, I made a claim for wrongful termination, wrongful intentional conduct, slander and libel against CNA." Pipitone allegedly advised Donnelly that the treatment to which other CNA employees subjected him was growing worse and "included slander and libel contained in performance appraisals, all deliberately done to damage [him] personally and that [the matter] was going to end up in litigation." According to Pipitone, Donnelly "acknowledged that [Pipitone] was being terminated and . . . very specifically solicited . . . a demand to settle all claims [Pipitone] had against CNA."

The district court discounted the worth of Pipitone's declaration in light of its self-serving nature and the contrary evidence submitted by CNA supporting the argument that the $95,000 payment constituted severance pay. Despite the self-serving nature of Pipitone's declaration, it is difficult to conceive of what other evidence Pipitone could have presented regarding the alleged conversation with Donnelly short of recording their conversation or ensuring the presence of a third person during their conversation. For this reason, we are persuaded to accept Pipitone's declaration as sufficient evidence to support the existence of an underlying tort or tort-type claim for purposes of this appeal. Because Pipitone cannot show that the settlement was entered into on account of personal injuries or sickness (the second requirement set forth in *Schleier*), our conclusion regarding whether he has established such a claim ultimately has no impact on the outcome of this case.

■ The second requirement that must be satisfied in order to conclude that a payment is excludible under § 104(a)(2) is a showing that the settlement was actually entered into on account of personal injuries or sickness. *See Schleier*, 515 U.S. at 337, 115 S.Ct. 2159. In doing so, we first examine the language of the Settlement Agreement itself. According to its terms, the Settlement Agreement provides sweeping references to the release and discharge of:

> [A]ny and all matters, claims, actions, demands, causes of actions, accounts, obligations or liabilities arising out of and relating to [Pipitone's] employment of every nature and kind whatsoever in law or in equity that [Pipitone] now ha[s] or ever had from beginning of time to the date of the execution of this Agreement, whether known or unknown, against the Company, including, but not limited to, any right to severance or benefits other than that specified in the instant Agreement and any claims [Pipitone] ha[s]

pursuant to the provisions of the [ADEA].. . .

Furthermore, the Settlement Agreement included a covenant whereby Pipitone agreed:

[N]ot to file a claim with any local, state or federal government agency, department or commission alleging the Company as a respondent, defendant, or participant, and (b) not to accept any relief which might be awarded to [him] by any such local, state or federal governmental agency, department or commission, and (c) not to sue the Company pursuant to any provision of the United States Code, including but not limited to the [ADEA], or any local or state law with respect to any and all matters ... released and discharged pursuant to the terms of this Agreement.

Except in the broadest sense, the Settlement Agreement lacks any express statement regarding what claims the $95,000 payment to Pipitone was intended to settle. Indeed, by its terms, the provisions requiring Pipitone to release and discharge all claims contemplated by the Settlement Agreement fail to make any allocation between tort and tort-like claims that may be covered by § 104(a)(2) and other types of claims that do not fall within the realm of § 104(a)(2). The existence of an agreement that contains a release of undisclosed or potential claims is not sufficient evidence standing on its own to demonstrate that the amounts paid under the agreement are eligible for exclusion under § 104(a)(2). *See Ball v. Commissioner,* 163 F.3d 308, 309 (5th Cir.1998) ("The case law is substantial, clear, and unanimous to the effect that releases of the broad, generic type signed [by a taxpayer] in connection with the termination of [their] employment—at a time when no claims exist, whether or not previously asserted or articulated—do not fall within the ambit of I.R.C. § 104(a)(2).").

■ When a settlement agreement lacks express language stating what the settlement amount was paid to settle, the most important factor for courts to consider is the intent of the payor. *See Kurowski v. Commissioner,* 917 F.2d 1033, 1036 (7th Cir.1990) ("Since the settlement agreement did not expressly state that the payment was made on account of personal injuries, the payor's intent in making the payment becomes controlling."); *Knuckles v. Commissioner,* 349 F.2d 610, 613 (10th Cir.1965) ("The most important fact in making that determination, in the absence of an express personal injury settlement agreement, is the intent of the payor as to the purpose in making the payment."). The government contends that CNA's $95,000 payment to Pipitone constituted severance pay and, therefore, was fully taxable. *See Carey v. Commissioner,* 74 T.C.M. (CCH) 705, 708 (1997) ("Severance pay, just like the pay it replaces, is taxable income"). This contention is supported by evidence in the record.

Although not conclusive, provisions of the Settlement Agreement certainly shed light on CNA's intent regarding the payment. These provisions demonstrate that CNA intended the payment to Pipitone to be severance pay. The Settlement Agreement is a general release of all claims and makes no specific reference to whether the payment compensated Pipitone for personal injuries or sickness. "[F]ailure to show the specific amount of the payment allocable to the claims of tort or tort-like damages for personal injuries results in the entire amount's being presumed not to be excludible." *Wise v. Commissioner,* 75 T.C.M. (CCH) 1514, 1517 (1998). Additionally, the Settlement Agreement contemplated that the $95,000 would be paid to Pipitone "less applicable Federal, State and Local deductions." The withholding of taxes is a significant factor suggesting the employer intended a payment to constitute severance pay. *See Nagourney v. Commissioner,* 57 T.C.M. (CCH) 954, 957 (1989), *aff'd. without published opinion,* 904 F.2d 700 (4th Cir.1990).

Further indicia of CNA's intent when it entered into the Settlement Agreement ex-

ist beyond the words of the Settlement Agreement as well. The manner by which CNA calculated the amount of the payment contemplated by the Settlement Agreement also suggests that CNA intended the payment as severance pay based on the length of Pipitone's service and his salary. Before the district court, the government submitted two internal memoranda written by Judith Samuel, CNA's Vice President of Human Resources: the first memorandum summarized Pipitone's separation package; the second memorandum confirmed that Pipitone accepted the severance package by signing the release. The first memorandum provides that under CNA's severance policy, an employee would usually receive five months severance pay. CNA offered Pipitone an enhanced severance package providing for ten months severance pay based on his years of employment with CNA and his willingness to sign a general waiver releasing CNA from any liability in connection with his employment. CNA also included an additional two months of severance pay because CNA typically afforded employees with sixty days notice of a workforce reduction but did not have any meaningful work for Pipitone to occupy during such a period. These considerations brought Pipitone's total severance package to the equivalent of twelve months pay.

The government also submitted the declarations of Samuel and Donnelly that, although disputed by Pipitone in his own declaration, testify to the fact that CNA intended the $95,000 payment to be severance pay tied to Pipitone's salary and not compensation for injury or sickness. Both declarations characterize the $95,000 paid to Pipitone as severance pay based on his years of service, salary, and CNA's standard severance pay policy. Samuel's and Donnelly's declarations each state that in arriving at the amount of the payment to Pipitone, CNA did not take into account any claim by Pipitone based on personal injury or sickness.

Finally, and perhaps most importantly, the record is devoid of any evidence demonstrating what, if any, portion of the payments made to Pipitone was allocable to his alleged claims of tort or tort-type damages for personal injuries and sickness. The failure of a party seeking to demonstrate that certain amounts are excludible from income to present such evidence results in the entire amount being presumed to be taxable. *See Taggi*, 35 F.3d at 96. Even if we were to attempt to determine what portion of the settlement proceeds should be allocated to income and what portion, if any, should be excludible from income, we would conclude that the entire $95,000 payment was taxable as income. The pleadings, the evidence, the terms of the settlement, and the intent of the payor, each support the conclusion that the amount is severance pay and, therefore, fully taxable.

In light of the narrow construction afforded to exclusions from income, *see Kurowski*, 917 F.2d at 1036, we conclude that the lump sum of $95,000 paid to Pipitone by CNA pursuant to the Settlement Agreement does not fall within the exclusion from income set forth in § 104(a)(2).

### III. CONCLUSION

Viewing the evidence in the light most favorable to the non-moving party, we conclude that Pipitone failed to establish a genuine issue of fact regarding whether the $95,000 payment he received from CNA at the time of his termination was excludible from income pursuant to 26 U.S.C. § 104(a)(2). Accordingly, the district court's opinion granting summary judgment in favor of the government is AFFIRMED.