T.C. Memo. 2019-8

UNITED STATES TAX COURT

DANIEL R. DOYLE AND LYNN A. DOYLE, Petitioners <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket No. 26734-14.                    Filed February 6, 2019.

Steven G. Early, for petitioners.

Horace Crump, Caroline R. Krivacka, and Edwin B. Cleverdon, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  After Wacom Technology Corp. fired Daniel Doyle, he

sued for breach of contract, antitrust violations, civil conspiracy, failure to pay

wages, and wrongful discharge.  The parties settled, and Wacom agreed to pay

[*2] Doyle for his "alleged unpaid wages" and "alleged emotional distress." Wacom paid these amounts in two installments, and Doyle and his wife reported the payments on their 2010 and 2011 returns. But they took some weird deductions to zero out the emotional-distress payments. The Commissioner disallowed these deductions and asserted penalties.

FINDINGS OF FACT

Doyle's remarkable career began at Lehigh University, from which he graduated in 1979 with a bachelor's degree in finance and marketing. He landed a job at Intel and worked there for five or six years before moving to a startup company called Electronic Designs in 1986, long before droves of recent graduates (and dropouts) began moving to Silicon Valley to join the next Google or Facebook.

But Doyle had vision. Electronic Designs was a success, and it went public under the name White Electronic Designs in 1994. Doyle worked there for 22 years, dancing adeptly on the floating-log-in-the-rapids that is the tech sector. "After 22 years of business development, technology development," Doyle testified, "we morphed into the LCD touchscreen business, much like you'd know in the iPhone and iPad today, and I created or hold nine or ten different technology patents, currently all being used in the smart phones and tablet PCs." LCD stands

[*3] for "liquid crystal display," and most of Doyle's patents have to do with improvements to that technology. Those who read this opinion online are probably doing so on some device that in some way he helped invent. He and his coinventors have focused in particular on remedying the "washout" problem that LCD users experience when there is a lot of ambient light (e.g., direct sunlight).

Doyle left White Electronic Designs in June 2008 to start his own consulting business. He set that business up as an S corporation,[1] and any income or loss from it flowed through from a separate return to a Schedule E, Supplemental Income and Loss, that Doyle and his wife attached to their joint return. Wacom--the company behind "the pen-based technology * * * in * * * Samsung smart phones"--brought Doyle's new company in to consult. When the Great Recession took hold in the fall of 2008, Doyle took a break from his consulting company to join Wacom as an employee.

Wacom paid Doyle well, and he produced results. His contract--one that included a $220,000 base salary, performance bonuses, a company car, and stock

---

[1] A business that meets the requirements of section 1361 may elect to be treated as an "S corporation" and generally avoid corporate tax. Secs. 1362(a), 1363(a). An S corporation's income and losses, like a partnership's, flow through to its shareholders, who then pay income tax. See sec. 1363(b). (All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.)

**[*4]** options--yielded about $2.5 million over four years.  Wacom expected that in return Doyle would use his contacts to bring in more business.  Over the course of 15 months Doyle lined up seven or eight contracts with HP, Dell, and Lenovo; and investors in Wacom watched its stock price balloon by over 300% during that same time.  It seemed that Doyle and Wacom were a good fit.

But Doyle, as he puts it, "stumbled into a situation."  He had watched executives at other companies in the tech sector get caught up in anticompetitive schemes--schemes that led to guilty pleas, prison time, and quite large fines.  See Press Release, U.S. Dep't of Justice, Four Executives Agree to Plead Guilty in Global LCD Price-Fixing Conspiracy (Jan. 15, 2009), https://www.justice.gov/ opa/pr/four-executives-agree-plead-guilty-global-lcd-price-fixing-conspiracy.  So, when he found himself in what he thought was a similar situation, he found himself a lawyer.[2]  The lawyer told him that he should either leave Wacom

---

[2] Doyle's settlement agreement with Wacom includes a confidentiality clause, and we admitted the agreement into evidence under seal.  Doyle was therefore vague at trial about the details of any events at Wacom, and we are similarly vague about relaying those details here.  The parties themselves referred to some of the material terms of the settlement in their briefs; we will do the same, as they are necessary to decide this case and are not introduced to "prove or disprove the validity or amount of * * * [the settled] claim."  See Fed. R. Evid. 408; see also United States v. Pend Oreille Pub. Util. Dist. No. 1, 926 F.2d 1502, 1507 n.4 (9th Cir. 1991); Marine Midland Realty Credit Corp. v. LLMD of Mich., Inc., 821 F. Supp. 370, 373 (E.D. Pa. 1993).

**[*5]** immediately or bring his complaints to the company's CEO. Doyle chose the latter, and in early December 2009 he met with Wacom's CEO and executive vice president.

He was fired a week later.[3] Doyle says that he had always been "[v]ery, very healthy," but that that all changed when Wacom fired him. He couldn't sleep, couldn't digest food properly, and had lots of other health problems. He struggled with chronic headaches, he couldn't concentrate, and he had neck, shoulder, and back pain. His relationship with his wife suffered, and he believes that he'll deal with some of these issues for the rest of his life. We find that these ailments are the consequence of the emotional distress he suffered when Wacom fired him.

When Wacom fired Doyle, he received no severance pay. He swiftly got back to work on the consulting business that he had started before he joined

---

[3] The record is a little murky about Doyle's last day at Wacom. He testified that he was fired on December 11, 2009, but his complaint in the civil suit against Wacom says only that he was asked to sign an "agreement severing his employment" on that date. The complaint also says that Doyle didn't sign the agreement, but that Wacom nonetheless stopped paying him on December 31, 2009 and "formally terminated his employment as of March 31, 2010." During cross-examination, Doyle testified that he received his last paycheck from Wacom on December 31, and that he was no longer working for Wacom as of that date. This confusion has no effect on this case.

[*6] Wacom.[4]  These troubles prompted him to sue (or at least threaten to sue)

Wacom in U.S. District Court[5] for five different causes of action:  breach of

contract, antitrust violations, civil conspiracy, failure to pay wages, and wrongful

discharge.  (We note that Doyle's complaint said nothing about personal physical

injuries or sicknesses or even emotional distress.)

Wacom wanted to settle, and it quickly agreed with Doyle on a

"Confidential Settlement Agreement and General Release" (settlement agreement)

less than two months later.  We will respect the parties' desire for confidentiality,

but some terms are essential to resolving this case--Wacom's agreement to pay

Doyle "$350,000 as settlement for his alleged unpaid wages" and "$250,000 as

settlement for his alleged emotional distress damages."  Both amounts were to be

paid in two installments--one in 2010 and the rest in 2011--and the settlement

---

[4] This was no easy task:  Doyle plausibly testified that Wacom interfered with at least one of his business relationships by threatening to withhold its business from the customer unless it stopped doing business with him.

[5] The Commissioner points out in his brief that there's "no indicia" that the complaint in evidence was filed in District Court, and that the sealed settlement agreement with Wacom "refers only to a draft complaint that had been sent to * * * [Wacom] and in no manner references pending litigation as opposed to imminent, but unfiled, litigation."  It's true that this is yet another fact on which the trial record is hazy, but the parties' joint stipulation of facts does state that "Doyle filed a Complaint against Wacom in U.S. District Court, Western District of Washington at Tacoma."  We'll therefore accept that as fact, though it doesn't affect the outcome of this case.

[*7] agreement said Wacom would issue Doyle a Form W-2 for the "alleged unpaid wages" and a Form 1099 for the "alleged emotional distress damages." The settlement agreement also stated that Doyle had "reviewed * * * [it] with his attorney," that he had "a period of up to twenty-one (21) days in which to consider * * * [it]," and that he had a "statutory period of seven (7) days after signing * * * [it] to reconsider and revoke * * * [it]," but that he waived the revocation period "with the advice and aid of counsel." Aside from a confidentiality agreement that Doyle signed when Wacom hired him, the settlement agreement "reflect[ed] the entire agreement between the Parties with respect to the matters set forth in it."

Wacom paid Doyle $125,000 of the "alleged emotional distress damages" in 2010 and the remaining $125,000 in 2011; it issued him a Form 1099-MISC for each payment. The Doyles timely filed their 2010 return and attached to it a Schedule C, Profit or Loss From Business, on which they reported Wacom's first $125,000 payment. They reported on the Schedule C that their trade or business was an "[u]nclassified establishment[]," and they deducted $23,584 for "[l]egal and professional services" and $101,416 for "personal injury"--precisely enough to offset the entire $125,000 payment. They also deducted another $33,000 for legal fees for that year on their Schedule A, Itemized Deductions.

[*8]   The Doyles did not file their 2011 return on time;[6] otherwise, it bore many similarities to their 2010 return.  They once again reported the $125,000 payment from Wacom on a Schedule C for an unclassified trade or business, and they zeroed out that income with a $125,000 deduction for "[p]ain and [s]uffering."  On that Schedule C, they also reported about $28,000 in additional income and deducted $55,000 for "[l]egal and professional services," as well as smaller amounts for supplies, travel, meals and entertainment, and telephone expenses.  The Doyles' reporting position on their 2010 and 2011 returns meant that they didn't pay tax on the payments they received from Wacom for the "alleged emotional distress damages."

This was all consistent with the advice of Herbert Hunter, the Doyles' CPA, who testified at trial.  Hunter has an MBA in finance and accounting from Cornell University and has been practicing as a CPA since 1968.  He'd done the Doyles' taxes for a decade, but 2010 and 2011 were different because of the settlement payments.  How did Hunter think those should be reported?  "Those payments

---

[6] The exact date they filed this return is another point of contention for which the Commissioner calls into question a fact that he's already stipulated.  The stipulation says the Doyles filed their 2011 return on March 14, 2013, but the Commissioner says in his brief that he believes they didn't file until June 24, 2013.  Once again, we accept the stipulated facts as facts and therefore find that the Doyles filed their 2011 return on March 14, 2013.

[*9] were issued by the payor as 1099 Miscellaneous," Hunter testified, "so we reported them on a Schedule C, showing the amount, and then deducting them as injury deductions on the return, so that we're reporting all the information but explaining why we treated them as nontaxable." Hunter says he did some research and went to a seminar, and he determined the payments were nontaxable under section 104(a)(2). He admitted at trial, however, that the Doyles' Schedule C was not for any trade or business, but he thought he had to report the settlement payments the way he did because "the other alternative is to report it under miscellaneous income, which requires a lot of clarification, and that to me, is burying facts."

The Commissioner audited the Doyles' 2010 and 2011 returns and issued a notice of deficiency that included, among other things, several adjustments to their Schedules C. The Doyles--Arizona residents at the time[7]--timely petitioned our Court. The issues left for us to decide are whether the emotional-distress payments are excludable from income, whether the Doyles properly deducted their legal fees, and whether they are liable for a section 6651(a)(1) addition to tax for

---

[7] This case is therefore appealable to the Ninth Circuit. See sec. 7482(b)(1)(A).

[*10] 2011 and section 6662(a) penalties.[8] The Commissioner didn't introduce any evidence at trial that he'd complied with section 6751(b)(1) for the section 6662(a) penalties. See Graev v. Commissioner (Graev III), 149 T.C. __, __ (slip op. at 14 n.14) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

OPINION

I.    Emotional Distress Damages

Section 61(a) says that "gross income means all income from whatever source derived," and the Supreme Court has "repeatedly emphasized the 'sweeping scope' of this section and its statutory predecessors." Commissioner v. Schleier, 515 U.S. 323, 327 (1995) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955)). This robust rule of taxability has exceptions. The one we consider here is section 104(a)(2), which excludes from gross income "any damages (other than punitive damages) received (whether by suit or agreement

_____

[8] The first two issues were the only ones raised by the Doyles in their Tax Court petition. Although they failed to challenge the section 6651(a)(1) addition to tax and section 6662(a) penalties in their petition, much of the trial focused on the Doyles' CPA and his advice. That makes it an issue tried by consent, and we will treat the issue of the Doyles' liability for the addition to tax and penalties as if it had been raised in the pleadings. See Rule 41(b); El v. Commissioner, 144 T.C. 140, 149 (2015).

**[\*11]** and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." The Doyles say that this exclusion applies to the payments they received from Wacom for emotional-distress damages. We must, however, narrowly construe exclusions from income, see Schleier, 515 U.S. at 328, and settlement proceeds are excludable under section 104(a)(2) only if the settlement is paid "on account of personal [physical] injuries or [physical] sickness," Rivera v. Baker W., Inc., 430 F.3d 1253, 1256 (9th Cir. 2005) (alterations in original) (quoting Schleier, 515 U.S. at 337).[9]

For a taxpayer to fall within this exclusion, he must show that there is "a direct causal link between the damages and the personal injuries sustained." Id. at 1257 (internal quotations and citations omitted). Where, as here, a taxpayer settles a potential suit, we look at the nature of the claim that was the basis for the settlement. United States v. Burke, 504 U.S. 229, 237 (1992); see also Bagley v. Commissioner, 105 T.C. 396, 406 (1995) ("[T]he critical question is, in lieu of

---

[9] There used to be another requirement--that a settlement be a payment for "tort or tort-type rights." The Commissioner abandoned this requirement when he amended the regulations in January 2012, and a taxpayer can choose to apply the new regulations retroactively to certain damages paid before. The Doyles, however, haven't asked us to apply the new regulations, sec. 1.104-1(c)(1), (3), Income Tax Regs. (as amended by T.D. 9573, 2012-12 I.R.B. 498), though we can't say that the new regulations would be more favorable to them. Cf. Simpson v. Commissioner, 141 T.C. 331, 346 n.13 (2013), aff'd, 668 F. App'x 241 (9th Cir. 2016); Molina v. Commissioner, T.C. Memo. 2013-226, at \*9 n.6.

[*12] what was the settlement amount paid[?]"), aff'd, 121 F.3d 393 (8th Cir. 1997). We look first at the settlement agreement itself to see if "it expressly states that the damages compensate for 'personal physical injuries or physical sickness.'" Rivera, 430 F.3d at 1257 (quoting section 104(a)(2)) (citing Pipitone v. United States, 180 F.3d 859, 863 (7th Cir. 1999)). If the settlement agreement is silent, we try to figure out the intent of the payor from "all the facts and circumstances of the case, including the complaint that was filed and the details surrounding the litigation." Id. (quoting Allum v. Commissioner, T.C. Memo. 2005-177, 2005 WL 1692488, at *4, aff'd, 231 F. App'x 550 (9th Cir. 2007)).

Our detective work here begins and ends with the settlement agreement. It states that Wacom agreed to pay Doyle "$250,000 as settlement for his alleged emotional distress damages (non-economic) alleged in his claim for wrongful discharge in violation of public policy." This is enough for us to find that the $250,000 was for Doyle's emotional distress, and leads us to the next question: Is Doyle's "alleged emotional distress" a personal physical injury or physical sickness? The Code tells us it isn't. Section 104(a) specifically commands that "emotional distress shall not be treated as a physical injury or physical sickness," and caselaw tells us that emotional distress includes symptoms such as insomnia, headaches, and stomach problems that result from such distress. See Pettit v.

[*13] Commissioner, T.C. Memo. 2008-87, 2008 WL 928090, at *4; see also H.R. Conf. Rept. No. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041. If we stopped at the language in the settlement agreement, we would hold that the emotional-distress payments Doyle received in 2010 and 2011 are not excludable from income under section 104(a)(2). See, e.g., Hansen v. Commissioner, T.C. Memo. 2009-87, 2009 WL 1139469, at *7 (finding similar settlement-agreement language meant the payments were not excludable under section 104(a)(2)).

The Doyles argue, however, that we can't stop there. Stress, they argue, is not the same as emotional distress. They argue that one can't really distinguish symptoms of emotional distress from symptoms of other physical injuries or sicknesses because "[p]hysical relates to both the body and mind which are inseparable in a person." And they specifically claim that Wacom actually intended to pay Doyle "for his personal physical sickness caused by the stress of his wrongful termination." Doyle's testimony is the only evidence in the record that suggests the settlement was for his physical injuries or sicknesses, and even he was unclear about that. He testified that the settlement "was very much attributed to [his] personal injuries." But Doyle's list of ailments--e.g., nausea, vomiting, headaches, backaches--are included in the definition of emotional distress when they result from such distress, see Pettit, 2008 WL 928090, at *4;

**[\*14]** see also H.R. Conf. Rept. No. 104-737, supra at 301 n.56, 1996-3 C.B. at 1041, and he himself testified that his ailments are the consequence of the emotional distress he suffered when Wacom fired him.  Doyle's own testimony therefore undermines his eligibility for excluding this part of the settlement under section 104(a)(2).  And while we have ourselves noted the crumbling barrier between psychiatry and neurology, see Alhadi v. Commissioner, T.C. Memo. 2016-74, where the Code itself assumes a dualist view of the mind and body we must assume such a view as well when we apply the Code to the facts of a particular case.  The Doyles may well be right ontologically, but not legally.

The Doyles have one last argument, though, to shift our focus away from the language of the settlement agreement.  They argue that, even though Doyle was represented by counsel in his settlement negotiations with Wacom, the settlement agreement itself doesn't accurately reflect the basis of the settlement.  They are, in other words, asking us to look beyond the language of the settlement agreement to consider the "intent of the payor" based on all the facts and circumstances of the case.  See Rivera, 430 F.3d at 1257.

The text of the settlement agreement make this argument hard to believe.  The agreement itself says that Doyle had reviewed it with his attorney, that he had a 21-day period to consider it, and that he even chose to waive a 7-day "statutory

[*15] period" that he would've had to reconsider and revoke it. The Doyles don't argue that any of those statements are untrue, but that's of little consequence--even if we thought the settlement agreement was ambiguous about the "alleged emotional distress damages," we'd still hold that the payments aren't excludable under section 104(a)(2).

The settlement was rooted in mutual releases and promises, one of which was a general release by Doyle of "any and all claims, known or unknown, asserted or not, arising from, by reason of, or related to, his employment with Wacom, the termination of that employment," or his employment agreement. That's a problem for the Doyles, because "the nature of underlying claims cannot be determined from a general release that is broad and inclusive, * * * and * * * all settlement proceeds are included in gross income where there is a general release but no allocation of settlement proceeds among various claims." Molina, T.C. Memo. 2013-226, at *12 (first citing Connolly v. Commissioner, T.C. Memo. 2007-98, 2007 WL 1201543, at *3; and then citing Evans v. Commissioner, T.C. Memo. 1980-142). And that problem's only made worse by the nature of Doyle's underlying claims in his complaint against Wacom, which were all rooted in economic or contract matters having nothing to do with physical injury or physical sickness.

**[*16]** In the end, it may indeed be imprecise to label any psychological ailment nonphysical--and we do find Doyle to be entirely credible in his description of the distress he suffered. But the Code says what it says, and the evidence in the record shows that no part of Doyle's emotional-distress payments were "on account of personal physical injuries or physical sickness" within the meaning of section 104(a)(2). Those payments are therefore not excludable from income under that section, and any unusual deductions the Doyles took to offset them are disallowed.[10]

## II.    Deductions for Legal Fees

For 2010, the Commissioner doesn't contest the amount of the Doyles' deductions for legal fees, but he does argue that they should've taken them all on their Schedule A. The Doyles' 2011 deduction is different; the Commissioner says they aren't entitled to any legal-fees deduction for that year.

---

[10] A taxpayer can exclude from income "an amount of damages not in excess of the amount paid for medical care * * * attributable to emotional distress," see sec. 104(a) (flush language), but he can't deduct what he's excluded, see sec. 265(a)(1). The Doyles concede in their posttrial briefs that they deducted all allowable family medical expenses on their 2010 and 2011 returns--including those related to Doyle's emotional distress--and they didn't keep separate track of them. If they took the exclusion then, they couldn't have the deduction, and we don't otherwise have enough evidence even to estimate what, if any amount, is potentially excludable. See, e.g., Gaerttner v. Commissioner, T.C. Memo. 2012-43, 2012 WL 468514, at *3. So we won't apply this exception to the exception here.

**[*17]** A.     2010 Deduction

We'll start with the 2010 deductions.  On their 2010 return, the Doyles reported over $30,000 in legal fees as an itemized deduction on their Schedule A and another $23,000 in legal fees as a business expense on their Schedule C for an "[u]nclassified establishment[]."  In his notice of deficiency, the Commissioner allowed both these deductions, but he moved the $23,000 deduction to the Doyles' Schedule A.  Schedule A miscellaneous itemized deductions are allowed only to the extent they exceed two percent of adjusted gross income, see sec. 67(a), while Schedule C business expenses are fully deductible, see sec. 62(a)(1).

The Doyles' problem is that legal fees are deductible under section 162 only if they are for a claim that arose in connection with Doyle's trade or business.  See United States v. Gilmore, 372 U.S. 39, 48-49 (1963); Biehl v. Commissioner, 118 T.C. 467, 477-78 (2002), aff'd, 351 F.3d 982 (9th Cir. 2003).  While a taxpayer may be in the trade or business of being an employee, see O'Malley v. Commissioner, 91 T.C. 352, 363-64 (1988), legal fees connected to his employee status are treated as miscellaneous itemized deductions and subject to the two-percent floor of section 67(a), see sec. 62(a)(1) (trade-or-business expenses deductible against gross income only "if such trade or business does not consist of the performance of services by the taxpayer as an employee"); McKay v.

[*18] <u>Commissioner</u>, 102 T.C. 465, 493 (1994), <u>vacated on other grounds without published opinion</u>, 84 F.3d 433 (5th Cir. 1996); <u>Alexander v. Commissioner</u>, T.C. Memo. 1995-51, 1995 WL 35344, at *2, <u>aff'd</u>, 72 F.3d 938 (1st Cir. 1995). Doyle was, without question, an employee of Wacom before it fired him, but the Doyles argue that their $23,000 deduction for legal fees is connected to Doyle's consulting business, not his employment at Wacom. They say those legal fees have nothing to do with Doyle's settlement with Wacom, because they paid for "legal matters related to intentional interference with * * * [Doyle's consulting] trade or business."

Doyle and Hunter did testify that Doyle has a consulting business, and Doyle also said that Wacom interfered with one of his customer relationships after he was fired. But they didn't say anything about Doyle's suing Wacom for *that*, and there's no evidence in the record about any "legal matters related to intentional interference" with Doyle's consulting business. Hunter also testified that Doyle's consulting business is an S corporation whose flowthrough income or loss should be reported on a Schedule E, yet the Doyles reported the deduction at issue on a Schedule C for an "[u]nclassified establishment[]"--a "trade or business" that Hunter created so he could report and zero out the emotional-distress payments. The Doyles can deduct legal fees under section 162 for their

[*19] alleged tortious-interference claim only if there's evidence the claim arose in connection with Doyle's trade or business. See Gilmore, 372 U.S. at 48-49. Here, we have no evidence that such a claim existed, let alone evidence that it arose in connection with Doyle's consulting business. If that were all, we would therefore disallow the $23,000 deduction for legal fees that the Doyles reported on their 2010 Schedule C. See McKay, 102 T.C. at 494 (disallowing a deduction for legal fees where taxpayers failed to offer evidence they're entitled to it).

But the Commissioner concedes that the Doyles can have that deduction as a miscellaneous itemized deduction on their Schedule A for 2010. Though he hasn't said as much, the Commissioner's concession seems to be premised on his belief that the 2010 legal fees arose in connection with Doyle's employment at Wacom--that is, "the transaction[s] subject to the litigation 'arose in the context of * * * [his] trade or business'" of being an employee. Biehl, 118 T.C. at 478 (quoting McKay, 102 T.C. at 488 n.23) (citing Alexander, 1995 WL 35344). When litigation arises from and is related to a taxpayer's prior employment--as the claims Doyle levied against Wacom were--the legal fees for that litigation are connected to his trade or business of being an employee. See Biehl, 118 T.C. at 477-78; McKay, 102 T.C. at 488-89; Alexander, 1995 WL 35344, at *6. The

**[\*20]** Commissioner's concession therefore makes sense for 2010, and we'll sustain his adjustment on this item.

B.      2011 Deductions

The Doyles have no such luck for 2011.  For that year, they claimed no Schedule A deductions for legal fees, but they did deduct $55,000 in legal fees on their Schedule C for an unclassified trade or business.  They once again argue that this deduction is a section 162 trade or business expense that has nothing to do with Doyle's settlement with Wacom and everything to do with "legal matters related to intentional interference with * * * [his consulting] trade or business." As we've said, we don't doubt that Doyle had a consulting business or even that Wacom interfered with one of his customer relationships, see supra p. 18, but there's no evidence in the record of any "legal matters related to intentional interference" and no evidence that any claim arose in connection with Doyle's consulting business, see Gilmore, 372 U.S. at 48-49.  The Commissioner doesn't concede that this deduction is allowable for 2011, so we sustain his disallowance of the Doyles' 2011 deduction for legal fees.  See McKay, 102 T.C. at 494.

**[*21]** III.    <u>Penalties</u>

All that remains are an addition to tax under section 6651(a)(1) and accuracy-related penalties under section 6662(a).  The Doyles concede the former, so only the accuracy-related penalties are left.

Section 6662(a) imposes a 20% penalty for underpayments due to "any substantial understatement of income tax," <u>see</u> sec. 6662(b)(2), (d), or "[n]egligence or disregard of rules or regulations," <u>see</u> sec. 6662(b)(1), (c).  The Commissioner says the Doyles are liable for accuracy-related penalties on both grounds, and it's easy enough to see that there seems to have been a substantial understatement at least:  Section 6662(d)(1)(A) says that an understatement is substantial if it is greater than $5,000 or "10 percent of the tax required to be shown on the return;" the Doyles' tax understatements in 2010 and 2011 easily exceed both those marks.

The Doyles argue, however, that they shouldn't be held liable for the penalties because they had reasonable cause and acted in good faith.  <u>See</u> sec. 6664(c)(1); sec. 1.6664-4(a)(1), Income Tax Regs.  They explain that they hired Hunter--an experienced and outwardly qualified CPA--to prepare their 2010 and 2011 returns; they are not tax experts; they gave Hunter accurate and complete records; and they thought his advice was reasonable and relied on it in good faith.

**[\*22]** Theirs is a reliance defense, and <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002), tells us how to evaluate it. We look for three factors:

- was the adviser a competent professional with sufficient expertise to justify reliance;

- did the taxpayer provide necessary and accurate information to the adviser; and

- did the taxpayer actually, and in good faith rely on the adviser's judgment?

<u>Id.</u> at 99.

Hunter appeared more than competent to advise the Doyles. He's an Ivy League-educated CPA with over forty years of experience preparing tax returns, and he'd done the Doyles' returns for a decade. Hunter is licensed to practice his profession in four states, teaches college accounting classes, and gave the impression that he stays current with federal tax issues. Even if the Doyles were knowledgeable about tax law--which they're not--we'd find that Hunter seemed competent enough to justify their reliance.

We also find that the Doyles provided Hunter with all the information he needed to accurately prepare their returns. Hunter credibly testified that he'd reviewed the settlement agreement and other documents about the settlement--

[*23] documents that we find exist, but which the Doyles failed to introduce into evidence.  He also explained, and we believe him, that Doyle's "wife provide[d] very extensive logs and records," and that he and Doyle "conversed quite a bit on all of his returns."  The Doyles easily satisfy the first and second factors for their reliance defense.

The third factor demands a deeper look.  Although Doyle is a sophisticated businessman, his testimony left us with the distinct impression that he lacks tax experience or knowledge.  That gives some much-needed color to his admission that he only briefly reviewed the returns Hunter prepared.  "Probably like most people," Doyle testified, "you look at the bottom line and see how much you have to pay or how much you're getting back, to be quite honest."  Doyle's testimony on this point was honest, and we find it reasonable given his lack of tax expertise-- he had "a lot of confidence in Mr. Hunter" and "so [he] trusted" him.  So we find that Doyle actually relied on Hunter's advice.

And we find that the Doyles' reliance on Hunter's advice was reasonable and in good faith.  We've recognized that the line between excludable and includable damages under section 104(a)(2) is a thin one, see Blackwood v. Commissioner, T.C. Memo. 2012-190, 2012 WL 2848677, at *6 (there is some "level of uncertainty regarding when physical manifestations of emotional distress

**[*24]** give rise to a physical injury or physical sickness"), and even *erroneous* professional advice about that is good enough to prove reasonable cause, see Longoria v. Commissioner, T.C. Memo. 2009-162, 2009 WL 1905040, at \*10-\*12 (finding reasonable reliance even though CPA failed to consider nature of claims and terms of settlement). We've even held that advice in this area from individuals who lack "specialized knowledge in tax law" can be relied on to avoid accuracy-related penalties. See Stadnyk v. Commissioner, T.C. Memo. 2008-289, 2008 WL 5330828, at \*7, aff'd, 367 F. App'x 586 (6th Cir. 2010). Hunter's reporting method was odd--including settlement payments and offsetting deductions on Schedules C--but his explanation for it was innocent enough; he advised the Doyles that the emotional-distress payments were not taxable, and he credibly testified that he reported them the way he did so that the Doyles were "reporting all the information but explaining why we treated them as nontaxable." There's nothing in the record that indicates the Doyles should've been skeptical about this advice. Under these circumstances, we wouldn't expect the Doyles to second-guess their CPA's advice. See Boyle v. Commissioner, 469 U.S. 241, 251 (1985). The Doyles had reasonable cause and acted in good faith, and they are therefore not liable for the accuracy-related penalties.

[*25] Even if, however, the Doyles were unreasonable and acted in bad faith, there's another reason why they wouldn't be liable for the accuracy-related penalties. Part of the Commissioner's burden of production on penalties is to show that they were "personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1); see Graev III, 149 T.C. at ___ (slip op. at 14); see also Ford v. Commissioner, T.C. Memo. 2018-8, at *6, aff'd, ___ F. App'x ___, 2018 WL 5794470 (6th Cir. Nov. 5, 2018). The Commissioner introduced no evidence of supervisory approval for these penalties, so we wouldn't sustain them for that reason either. This is a split result, so

Decision will be entered under

Rule 155.