**MTS INTERNATIONAL, INC. and Robert C. Hughes, III, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 97–1789.

United States Court of Appeals, Sixth Circuit.

Submitted Dec. 18, 1998.

Decided March 4, 1999.

Dennis H. Shaw (briefed), Black & Shaw, Louisville, KY, for Petitioners–Appellants.

Teresa E. McLaughlin (briefed), Randolph L. Hutter (briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, D.C., for Respondent–Appellee.

Before: MERRITT, NORRIS, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Taxpayers MTS International and Robert C. Hughes, III appeal from a decision of the tax court finding that (1) a loss that Hughes sustained in connection with a stock sale was a capital loss rather than a theft loss for tax purposes, (2) withdrawals that Hughes made from MTS accounts were constructive dividends upon which he owed taxes, and (3) MTS was not entitled to deduct $196,672 for travel and entertainment expenses from its 1987 gross income. The taxpayers argue that a memorandum entered into between themselves and the government settled the dividend and entertainment expense issues, and that the trial court should have granted them further opportunity to prove this alleged settlement. For the reasons set forth below, we **AFFIRM** the tax court's judgment on all of the issues.

### I. BACKGROUND

Hughes is the president, sole director, and sole shareholder of MTS, a corporation with its principal place of business in Louisville, Kentucky. MTS collects debts for creditors and also engages in "factoring," the practice of purchasing accounts receivable at a discount from creditors with the hope of collecting their face value from the debtors.

In 1986, Hughes placed an advertisement in the *Los Angeles Times* seeking companies that would sell MTS their accounts receivable. Barry Minkow, president of ZZZZ Best Co., Inc., responded. Minkow represented to Hughes that ZZZZ Best performed carpet cleaning services and insurance restoration of buildings damaged by fire and water. Over the course of the summer of 1986, Minkow and ZZZZ Best's accountant provided Hughes with information about receivables that Minkow wanted MTS to "factor." The receivables were fraudulent, a fact not known by Hughes. MTS declined to purchase the receivables, finding that the documentation Minkow had provided was not sufficient to prove their existence.

In late 1986, ZZZZ Best went public. The company received coverage on television and in business magazines. In April of 1987, Hughes purchased 60,000 shares of ZZZZ Best stock for $912,560.69. He sold them shortly thereafter for $1,014,621.75, making a profit of $102,061.06.

Minkow and Hughes continued to discuss MTS's possible purchase of ZZZZ Best receivables in 1987. Minkow also told Hughes that ZZZZ Best stock was doing very well on the NASDAQ stock exchange, but he did not encourage Hughes to purchase such stock.

In May of 1987, a newspaper article charged Minkow with certain wrongdoings. The stock, however, continued to be actively traded on the NASDAQ exchange. In early June of 1987, Hughes purchased 50,000 shares of ZZZZ Best stock for $532,161.40. Shortly thereafter, a group of ZZZZ Best shareholders filed a class-action lawsuit against the company. Despite the lawsuit, Hughes purchased 20,000 additional shares of ZZZZ Best stock for $146,650 in mid-June of 1987.

After Hughes's June stock purchases, Minkow once again sent him information about the alleged receivables that were for sale. MTS did not purchase the receivables, however, because Minkow was still unable to provide sufficient documentation to verify their source and legitimacy.

Hughes sold his ZZZZ Best stock in June and July of 1987 for a loss of $633,540.68. Minkow and other ZZZZ Best officers were subsequently charged with various crimes, for which they were convicted in 1989.

On his 1987 federal income tax return, Hughes claimed a capital loss from his sale of the ZZZZ Best stock. He subsequently filed an amended tax return, claiming that the loss should instead be treated as a theft loss. The difference is significant, in that a capital loss is immediately deductible only against capital gains and no more than $3,000 of ordinary income in each taxable year (with the unused deduction being carried forward to later tax years), whereas a theft loss is immediately deductible in full against all taxable income. *See* 26 U.S.C. §§ 1211 and 165(e).

In 1992, the Commissioner of Internal Revenue issued notices of deficiency to Hughes and MTS. Three of the deficiencies in the notice are relevant to this appeal: (1) the loss from the ZZZZ Best stock sale,

which the Commissioner classified as a capital loss, (2) the Commissioner's finding that payments from MTS to Hughes constituted taxable dividend income, and (3) the Commissioner's disallowance of deductions that MTS had taken for alleged travel and entertainment expenses.

Hughes and MTS challenged the Commissioner's determinations in the United States Tax Court. On February 28, 1994, the parties executed a Memorandum that set forth the issues to be dealt with at trial. Prior to the trial, the parties settled several issues. Other issues remained open, however, and Hughes and MTS specifically requested trial on the issues of the stock loss, the distributions from MTS to Hughes, and the travel and entertainment expenses.

These three issues were tried before the tax court in November of 1994. The tax court held that the loss from Hughes's sale of the ZZZZ Best stock was not a theft loss entitled to full deductibility on Hughes's 1987 tax return, but was instead a capital loss subject to substantial restrictions on deductibility. It also found that MTS's distributions to Hughes constituted dividend income. Finally, the tax court held that MTS was not entitled to deduct expenditures allegedly made for travel and entertainment because the receipts that MTS presented did not show a business purpose.

Hughes and MTS filed a post-trial motion in which they argued that the tax court should have considered the February 28, 1994 Memorandum as settling the dividend and entertainment expense issues. They requested that the tax court conduct further trial proceedings concerning the extent to which the parties should be held bound by its terms. The tax court denied the motion. This appeal followed.

## II. ANALYSIS

**A. The tax court did not err in determining that the stock loss was a capital loss subject to the limitations in I.R.C. § 1211, and not a theft loss deductible in full under I.R.C. § 165(e)**

### 1. Determining theft loss

■ The tax court looks to state law to determine whether a particular loss constitutes a § 165(e) theft loss. *See Howard v.* *United States*, 497 F.2d 1270 (7th Cir.1974) (holding that the taxpayers, whose loss arose out of an agreement whereby a business associate was permitted to sell the taxpayer's stock, did not sustain a theft loss under Illinois law). *See also Estate of Meriano v. Commissioner of Internal Revenue*, 142 F.3d 651, 658 (3d Cir.1998) (stating that "theft" is defined by the jurisdiction in which the loss has occurred for the purpose of the theft loss deductions from income and estate taxes).

### 2. Standard of review

■ This court reviews the tax court's legal conclusions *de novo* and its findings of fact under the "clearly erroneous" standard. *See Parker–Hannifin v. Commissioner of Internal Revenue*, 139 F.3d 1090, 1095 (6th Cir.1998). The tax court's decision to apply Kentucky Revised Statutes § 514.040 is a legal conclusion. Its determination that Hughes did not rely upon Minkow's representations in purchasing the stock is a factual finding.

### 3. There was no theft under Kentucky law

■ Under Kentucky law, a person is guilty of theft by deception "when he obtains property or services of another by deception with intent to deprive him thereof." KRS § 514.040. Although the theft statute is silent as to whether reliance upon the deceptive behavior of the perpetrator is an element of this offense, the Kentucky Supreme Court has held that it is. *See Brown v. Commonwealth of Kentucky*, 656 S.W.2d 727, 728 (Ky.1983). Thus, in order to show that a theft occurred under Kentucky law, Hughes must demonstrate that he relied upon Minkow's representations regarding ZZZZ Best's finances in making his decision to purchase the stock.

The tax court found that Minkow encouraged Hughes to purchase ZZZZ Best accounts receivable, not ZZZZ Best stock. It referred to Minkow's testimony that he had no reason to want Hughes to purchase the stock, because Hughes's doing so would not help Minkow's personal financial situation. Furthermore, ZZZZ Best was reviewed in national publications and on television, and

the tax court found that Hughes purchased the stock on that basis.

The tax court also pointed out that Hughes initially made a profit on his trades in ZZZZ Best stock—over $100,000 in 1987. It reasoned that Hughes's experience with ZZZZ Best securities was the primary factor in his decision to invest again.

Finally, and most persuasively, the tax court found that Hughes mistrusted the information that Minkow had provided in attempting to induce Hughes to purchase the accounts receivable. Finding that the receivables were inadequately documented, and that too high a percentage of ZZZZ Best's assets were recorded as receivables, Hughes declined to factor the (fraudulent) receivables that Minkow attempted to sell him. Given Hughes's concession that he did not believe that the information received from Minkow was truthful, it would be illogical to find that Hughes relied upon that information in making a significant investment.

In support of his position that he did rely upon Minkow's statements in making the stock purchases, Hughes presented only his own testimony. The extensive and persuasive evidence that Hughes did not rely upon Minkow's misrepresentations, however, convinces us that the tax court's finding is not clearly erroneous. Such reliance is a necessary element of theft by deception under Kentucky law.

Furthermore, although the tax court's decision did not rely upon this fact, Minkow received nothing from Hughes's purchases of ZZZZ Best stock. This fails to meet the requirement of KRS § 514.040 that "[a] person is guilty of theft by deception when *the person obtains property or services of another* by deception with intent to deprive the person thereof." (emphasis added). There was thus no "theft" of Hughes's money under Kentucky law, because neither Minkow nor ZZZZ Best received any "property" when Hughes purchased ZZZZ Best stock on the open market.

For the foregoing reasons, we concur in the tax court's judgment that Hughes cannot report the loss as a theft loss.

**B. The tax court did not abuse its discretion when it failed to grant an additional hearing as to whether the February 28, 1994 Memorandum effected a settlement of the dividend and entertainment expense issues**

*1. Standard of review*

■ This court reviews the tax court's denial of a motion for further trial proceedings under the "abuse of discretion" standard. *See BASF Wyandotte Corp. v. Commissioner of Internal Revenue,* 532 F.2d 530, 539 (6th Cir.1976) (holding that the Tax Court did not abuse discretion in denying the taxpayer's untimely motion for additional proceedings). An abuse of discretion is found only when the appellate court has "a definite and firm conviction that the trial court committed a clear error of judgment." *SEC v. Johnston,* 143 F.3d 260, 262 (6th Cir.1998) (internal quotation marks and citation omitted).

*2. The dividend and entertainment expense issues were not settled by the parties*

■ In the February 28, 1994 Memorandum, the parties labeled the dividend and entertainment expense issues "Issue 1" and "Issue 2" respectively. The Memorandum provides in pertinent part as follows:

If the parties agree on Issues 1 and 2, then they will file promptly a stipulated decision. If the parties do not agree on either Issue 1 or Issue 2, the attached computations, once verified by petitioners, shall be the basis for a stipulation of settled issues. The computations would be adjusted to reflect the parties agreement at that time. Only Issue 1 or 2 or both and the 1987 theft loss of petitioner Robert C. Hughes, III would be tried.

This Memorandum appears to be more of an agreement on how to proceed at trial than a settlement of the dividend and entertainment expense issues.

In July of 1994, the taxpayers submitted a "Status Report" that defined the state of the parties' discussions to that point. It provides, in relevant part, as follows:

1. The parties have not settled the issues set forth in the Memorandum of Par-

ties dated February 28, 1994 and therefore have not prepared documents to file.

2. The Petitioner requests that the court enter an order that the following issues will be set for trial ...:

   a. The unsettled portion of the cancellation of debt and dividend issues of Robert C. Hughes, III (issue 1 in the memorandum of parties).

   b. The MTS travel and entertainment issue (issue 2 in the memorandum of parties).

   c. The 1987 theft issue of Robert Hughes, III.

In October of 1994, the parties stated in the Stipulation of Facts submitted to the court that:

All of the adjustments shown in the Statutory Notice of Deficiency for 1986 and 1987 have been resolved by agreement with the exception of: a) asserted 1987 dividend distributions to Petitioner in the remaining amount of $194,224.00; b) a 1987 claim for an alleged theft loss ...; and c) adjustments resulting from the remaining issues which will impact the computations of automatic adjustments and additions to tax.

It is apparent from the above submissions by the parties that the February 28, 1994 Memorandum did not express the parties' intent to settle these issues. Furthermore, even if we were to conclude that item (c) in the October Stipulation of Facts did not refer to the entertainment expense issue, we would still find that the tax court did not abuse its discretion in denying MTS's motion for further trial proceedings. The tax court stated that MTS's proposed evidence in support of the entertainment deductions—photocopies of hotel and restaurant receipts—would have been inadmissible because it did not indicate the business purpose for the expenses. Because the evidence that MTS wished the tax court to consider would not have entitled the company to an entertainment expense deduction, there was no reason to conduct further trial proceedings on that issue.

After the tax court ruled against Hughes and MTS, they again argued that the court unfairly refused to give effect to the Memorandum as an agreement to settle the dividend and entertainment expense questions.

In support of their motion to vacate and for further trial proceedings, the taxpayers offered to provide affidavits stating that they intended to settle the dividend and entertainment expense issues when they negotiated the Memorandum.

Because the February 28, 1994 Memorandum does not express an agreement to settle, because the taxpayers twice submitted subsequent documents to the tax court stating that the dividend and entertainment expense issues were not settled, and because the taxpayers offered no new evidence in support of reconsideration, we are not left with "a definite and firm conviction that the trial court committed a clear error of judgment" when it denied the taxpayers' motion for additional trial proceedings on these issues.

### III. CONCLUSION

For all of the reasons stated above, we **AFFIRM** the judgment of the tax court.