*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0347P (6th Cir.)
File Name: 03a0347p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN W. BANKS, II,
　　　*Petitioner-Appellant,*

　　　*v.*

COMMISSIONER OF INTERNAL
REVENUE,
　　　*Respondent-Appellee.*

Nos. 01-2171/2177

On Appeal from the United States Tax Court.
No. 18097-97—David Laro, Tax Court Judge.

Argued: March 12, 2003

Decided and Filed: September 30, 2003

Before: MOORE and CLAY, Circuit Judges; LAWSON,
District Judge.[*]

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** James R. Carty, MECKLER, BULGER & TILSON, Chicago, Illinois, for Appellant. Kenneth W. Rosenberg, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** James R. Carty, MECKLER, BULGER & TILSON, Chicago, Illinois, Roger J. Jones, Russell R. Young, MAYER, BROWN, ROWE & MAW, Chicago, Illinois, for Appellant. Richard Farber, John A. Nolet, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee.

CLAY, J., delivered the opinion of the court, in which LAWSON, D. J., joined. MOORE, J. (pp. 29-30), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

CLAY, Circuit Judge. This is a consolidated appeal from a decision of the United States Tax Court. In Case Nos. 01-2171 and 01-2177, Petitioner John W. Banks, II appeals from the tax court's decision in favor of the Commissioner of Internal Revenue finding, *inter alia,* deficiencies in Petitioner's income tax due for the taxable year 1990 in the amount of $99,068.00. In an accompanying memorandum opinion, the tax court ruled, *inter alia,* that (1) Petitioner could not exclude from gross income money he received pursuant to an out-of-court settlement, including the portion thereof his attorney had received as a contingency fee; and (2) Petitioner was not entitled to an income tax deduction in the taxable year 1990 for payments made to his former spouse as part of their divorce settlement. *See Banks v. Comm'r,* 81

T.C.M. (CCH) 1219, 2001 WL 196751, 2001 Tax Ct. Memo LEXIS 68 (Feb. 28, 2001). We **AFFIRM** in part and **REVERSE** in part the tax court's decision.

## I. FACTUAL BACKGROUND

### A. Petitioner's California Federal Court Lawsuit and Settlement

Petitioner worked as an educational consultant with the California Department of Education ("CDOE") from 1972 to 1986, when he was terminated. In response to his termination, Petitioner filed a civil action against the CDOE (and various past and present employees therein) in the federal district court for the Eastern District of California. Petitioner's second amended complaint alleged six counts. Counts 1, 2, and 3 alleged employment discrimination in violation of 42 U.S.C. §§ 1981 and 1983; Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. §§ 2000e to 2000e-17 (2000); and California Government Code § 12965, respectively. Counts 4, 5, and 6 asserted state law tort claims; specifically, Count 4 alleged intentional infliction of emotional distress, and Counts 5 and 6 alleged slander. Petitioner's lawsuit sought general damages, future medical and hospital expenses, punitive and exemplary damages, back pay and related employee benefits, various injunctions, and attorney's fees. In bringing the lawsuit Petitioner retained an attorney who agreed to represent Petitioner pursuant to a contingency fee agreement.

Settlement attempts failed, and Petitioner's case proceeded toward trial. The district court entered a final pretrial conference order on September 22, 1989. Under the "Abandoned Issues" section, the pretrial order stated, "[Petitioner] has abandoned all claims for damages relative to state tort claims, including a claim for intentional and negligent imposition of emotional distress, tortious interference with business relations, and defamation." (J.A. at 148.) Thus, according to the pretrial order, Petitioner

abandoned Counts 4, 5, and 6 of the second amended complaint, leaving the remaining claims (by process of elimination) as Counts 1, 2, and 3, i.e., the violations of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. The fact that the §§ 1981 and 1983 claims were still being litigated was evidenced elsewhere in the order, both in the "Points of Law" section (where the district court directed the parties to brief "[t]he elements, standards and burdens of proof relative to" §§ 1981 and 1983 claims) (J.A. at 147-48), and in the "Disputed Factual Issues" section (which includes the issue of "[w]hether the defendants acted under color of state law to deprive [Petitioner] of his rights, privileges and immunities secured by the Constitution by engaging in discriminatory practices").[1] (J.A. at 141-42.) Abandoning counts 4, 5, and 6, in itself, did not eliminate any of the forms of relief Petitioner originally had requested in his second amended complaint. However, the "Relief Sought" section of the pretrial order indicated the following: "[Petitioner] seeks only reinstatement, back pay, and attorneys' fees." (J.A. at 147.) The limitation on relief sought was also confirmed in the part of the pretrial order calling for a non-jury trial: "Although plaintiff had heretofore demanded a jury trial, he concedes that *since he now seeks only back pay and equitable relief,* a jury trial is not appropriate." (J.A. at 132) (emphasis added).

Petitioner's trial commenced, and nine days into the trial, at the court's urging, the parties held a settlement conference. Testimony at the tax court trial from Petitioner's attorney in

---

[1] The phrasing of this issue fairly represents the language of § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

the California federal court action, as well as a letter from Petitioner to an Internal Revenue Service ("IRS") agent, indicated that Petitioner had initially requested $850,000 during settlement discussions, and that he and his attorney had arrived at that proposed settlement figure based on Petitioner's salary. The defendants countered with an offer of $464,000, apparently arguing that Petitioner should take less money because he could designate the amount as personal injury damages and render it non-taxable. Petitioner and his attorney agreed to the $464,000 settlement amount, so long as it could be characterized in the settlement agreement as compensation for personal injury damages. However, Petitioner's attorney testified at the tax court trial that he warned Petitioner that although the settlement agreement could characterize the $464,000 proceeds as personal injury damages, there was no guarantee that the IRS would subsequently agree to this characterization.

On May 30, 1990, Petitioner and the CDOE entered into an agreement that settled all of Petitioner's outstanding claims for $464,000. The agreement provided, in part, as follows:

1.   The [CDOE] agrees object [sic] to pay to [Petitioner] of the sum of $464,000.00 in full and complete satisfaction of his claims. [Petitioner] characterizes this payment of $464,000.00 as payment for personal injury damages suffered after [Petitioner's] discharge on July 14, 1986.

(J.A. at 159.) Of this $464,000, Petitioner paid $150,000 to his attorney in fees, pursuant to the contingency fee arrangement between them. Petitioner did not include any of the $464,000 settlement proceeds as gross income on his 1990 federal income tax return.

## B.   Petitioner's Alimony Payment to His Former Spouse and Deduction

On November 1, 1984, the marriage of Petitioner and his first wife, Verna Banks, was dissolved. In adjudicating the impending dissolution, the California Superior Court issued an order, dated January 2, 1984, declaring that Verna Banks was entitled to 43.95% of Petitioner's gross monthly military retirement payments. Pursuant to this order, Petitioner began making payments to Verna Banks, but the payments did not start until 1987 and only constituted 43.95% of Petitioner's net, rather than gross, retirement payments. Consequently, arrears immediately began to accrue to Verna Banks. On April 6, 1988 and December 4, 1989, Verna Banks obtained orders for the arrearage, plus attorney's fees, and she later returned to court to enforce the orders in 1990. On October 30, 1990, the California Superior Court, taking note of Petitioner's recent out-of-court settlement with the CDOE, ordered Petitioner to pay Verna Banks $12,156.81 out of the $464,000 settlement proceeds from the civil lawsuit Petitioner had filed in federal district court in California. The court further ordered Petitioner to place an additional $20,000, plus $3,850 in attorney's fees, in an interest-bearing account until Petitioner began to make timely payments to Verna. The amounts the court ordered Petitioner to pay totaled $36,006.81.

In 1990, Petitioner paid $72,013.62 (double the $36,006.81 of the court's order in lieu of posting an appellate bond) into California Superior Court and filed several appeals, all of which ultimately proved unsuccessful. Eventually, Verna Banks agreed to receive Petitioner's $72,013 deposit in satisfaction of all arrears (except for $45,987 in arrears Petitioner owed Verna from 1979 to 1986). The court transferred the $72,013.62 to Verna in 1993, and Petitioner deducted the $72,013.62 in the 1993 tax year as an alimony payment deduction. However, at the tax court trial Petitioner argued that he was entitled to claim that deduction for the 1990 tax year.

### C. The Commissioner's Notices of Deficiency and the Tax Court's Decision

On May 30, 1997, the Commissioner issued a Notice of Deficiency to Petitioner for the tax year ending December 31, 1990,[2] in the amount of $101,168.00. Petitioner filed a petition in the tax court, requesting a redetermination of the deficiencies. The cases were consolidated, and the matter proceeded to trial.

On February 28, 2001, the tax court filed a Memorandum Findings of Fact and Opinion ("tax court opinion" or "opinion"). For purposes of this appeal, the tax court opinion made three relevant rulings. First, it determined that the entire $464,000 amount Petitioner received in settlement of his California federal court lawsuit constituted taxable income because, contrary to Petitioner's arguments, none of the settlement amount was attributable to a claim of personal injury. Second, the tax court determined that the $150,000 Petitioner had paid out of the $464,000 settlement amount to his lawyer as an attorney contingency fee was not excludable from income. Third, the tax court agreed with Petitioner that an alimony payment to Verna Banks could have been deducted from his gross income for the 1990 tax year, but it further held that Petitioner was now precluded by the "duty of consistency" doctrine from taking the deduction.

Consequently, the tax court held Petitioner liable for taxes on the full $464,000 settlement amount, and it disallowed any relevant deductions therefrom. A decision embodying these

---

three rulings was entered on May 21, 2001.[3] Petitioner's timely appeal followed.

## II. STANDARD OF REVIEW

We review the tax court's legal conclusions *de novo* and its factual findings for clear error. *Zack v. Comm'r,* 291 F.3d 407, 412 (6th Cir. 2002) (citing *MTS Int'l, Inc. v. Comm'r,* 169 F.3d 1018, 1021 (6th Cir. 1999)). We will conclude that a factual finding is clearly erroneous only if, upon our review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590, 595 (6th Cir. 2001)) (internal quotation marks omitted).

## III. ANALYSIS

### A. Whether the Amount Paid in Settlement of Petitioner's Lawsuit was Attributable to a Claim of Personal Injury.

Petitioner challenges on appeal the tax court's ruling that the $464,000 he received in settling his California federal civil action was not excludable from income under Internal Revenue Code § 104(a), 26 U.S.C. § 104(a). Specifically, Petitioner argues that the tax court erred in determining that no portion of the $464,000 settlement amount was attributable to personal injuries he alleged in that lawsuit. We are not persuaded by Petitioner's arguments and therefore affirm the tax court as to this issue.

Section 61 of the Internal Revenue Code states that "[e]xcept as otherwise provided in this subtitle, gross income means all income from whatever source derived." 26 U.S.C. § 61(a). In determining what constitutes gross income, we

---

[2] The Notice actually determined deficiencies for three tax years: 1988, 1990, and 1991. However, only tax year 1990 is at issue in this appeal.

[3] Pursuant to these rulings (and other rulings which neither side appealed), the tax court ruled that there existed a deficiency for Petitioner's 1990 tax year in the amount of $99,068.000.

construe § 61 "liberally 'in recognition of the intention of Congress to tax all gains except those specifically exempted.'" *Greer v. United States,* 207 F.3d 322, 326 (6th Cir. 2000) (quoting *Comm'r v. Glenshaw Glass Co.,* 348 U.S. 426, 430 (1955)).

Nevertheless, the Internal Revenue Code provides for a number of exclusions from income. One of these exclusions is found in § 104(a)(2), which permitted a taxpayer to exclude from income "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." 26 U.S.C. § 104(a)(2).[4] Damages received "on account of personal injuries" are to be distinguished from those received on account of back pay damages, for which no exclusion from income exists. *Comm'r v. Schleier,* 515 U.S. 323, 329-30 (1995).

The Supreme Court has held that a § 104(a) exclusion is warranted only where a two-prong test has been satisfied. First, the taxpayer must have received the damages amount through the litigation of an action (or a settlement thereof) based on tort or tort-type rights. Second, the amount must be paid on account of personal injuries or sickness. *Schleier,* 515 U.S. at 337. Moreover, regarding the second prong, a taxpayer must present "concrete evidence demonstrating the precise causal connection between" the taxpayer's asserted personal injuries and the settlement payment he or she received. *Greer,* 207 F.3d at 334. More recently, we "disaggregate[d]" the *Schleier* two-prong test into "its disparate elements," as follows:

---

[4]Section 104(a)(2) was amended in 1996 to limit exclusions from income for personal injuries or sickness to *physical* injuries or sickness. *See* Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1605(a), 110 Stat. 1755, 1838. However, because Petitioner's lawsuit settlement occurred prior to the passage of this amendment, this new limitation on § 104(a)(2) does not apply here. *See Greer,* 207 F.3d at 328.

To satisfy *Schleier,* the taxpayer must show that (1) there was an underlying claim sounding in tort; (2) the claim existed at the time of the settlement; (3) the claim encompassed personal injuries; and (4) the agreement was executed "in lieu" of the prosecution of the tort claim and "on account of" the personal injury.

*Id.* at 327.

Turning our attention to the first prong of the *Schleier* test, we observe that the proper inquiry "focus[es] on the origin and characteristics of the claims settled in determining whether such damages are excludible under § 104(a)(2)." *Id.* (quoting *Pipitone v. United States,* 180 F.3d 859, 862 (7th Cir. 1999)). A relevant aspect of this inquiry requires us to consider whether the claim at issue provides for remedies that "recompense [a plaintiff] for any of the . . . traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages," i.e., remedies other than economic damages. *See United States v. Burke,* 504 U.S. 229, 239 (1992). Because Petitioner abandoned the state tort claims prior to trial, the relevant claims to examine in this case are Counts 1 through 3 of Petitioner's second amended complaint, which represent Petitioner's claims brought under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

Applying this analysis, we agree with the Commissioner and the tax court that Petitioner's Title VII claim does not constitute "an underlying claim sounding in tort" for purposes of § 104(a)(2). *Greer,* 207 F.3d at 327. The Supreme Court has held that Title VII, at the time of Petitioner's civil lawsuit, "focuse[d] on legal injuries of an economic character," given that its "sole remedial focus [wa]s the award of back wages," and therefore did not "redress[] a tort-like personal injury within the meaning of § 104(a)(2) and the applicable regulations." *Burke,* 504 U.S. at 239, 241. It is true that Congress amended Title VII in 1991 to provide Title VII plaintiffs with additional monetary relief beyond back pay.

*See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1071, 1072-74 (1991) (codified at 42 U.S.C. § 1981a). However, Petitioner had sued the CDOE under the old version of Title VII ("pre-1991 Title VII"), and *Burke* directly controls the applicability of § 104(a)(2) to pre-Title VII damages. *Id.*[5]

Petitioner alternatively argues that his §§ 1981 and 1983 claims provide the requisite tort or tort-like claims on which to base his § 104(a)(2) exclusion. We agree with Petitioner. The Supreme Court has indicated (albeit in the statute of limitations, not the § 104(a)(2), context) that § 1983 claims constitute tort or tort-like actions. *See Wilson v. Garcia,* 471 U.S. 261, 280 (1985) (holding that § 1983 claims "are best characterized as personal injury actions"); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 724-25 (1999) (Scalia, J., concurring in part and concurring in the judgment) (applying *Wilson*'s rule to a Seventh Amendment inquiry).[6] Furthermore, although the Supreme Court has not expressly designated § 1981 as

---

[5] Although *Burke*'s authority has been questioned since the amendments to Title VII, its authority as to pre-1991 Title VII claims seems to be intact. *See, e.g., Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1220 (3d Cir. 1995) ("We note that amendments to Title VII made by the Civil Rights Act of 1991 allow a plaintiff to recover compensatory and punitive damages and thus throw doubt on the *continued* validity of the *Burke* holding.") (emphasis added).

[6] Several other circuits have held that § 1983 actions are tort actions within the meaning of § 104(a)(2). *See Wulf v. City of Wichita,* 883 F.2d 842, 872-73 (10th Cir.1989) (holding that the settlement proceeds of the taxpayer's § 1983 civil action compensated him for personal injuries and was excludable under § 104(a)(2)); *Metzger v. Comm'r,* 88 T.C. 834 (1987), *aff'd,* 845 F.2d 1013 (3d Cir. 1988) (holding that claims under 42 U.S.C. §§ 1981 and 1983, among others, constituted "personal injury" claims within the meaning of § 104(a)(2)); *Bent v. Comm'r,* 835 F.2d 67, 70 (3d Cir. 1987) (holding that the portion of the taxpayer's damages award pertaining to his § 1983 claim compensated him for his personal injuries and could properly be excluded under § 104(a)(2)).

constituting a tort or tort-like action, the Court strongly hinted in its *Burke* decision that it deemed § 1981 to fit into this category. *See Burke,* 504 U.S. at 240 (observing that the remedies available under pre-1991 Title VII "st[ood] in marked contrast not only to those available under traditional tort law, but under other federal antidiscrimination statutes," for instance § 1981, which offered as potential remedies "both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages").

The tax court had rejected Petitioner's alternative argument. Although the court conceded that § 1981 and 1983 claims constitute tort or tort-like actions, it found that, based on the district court's pretrial order entered in connection with his lawsuit against the CDOE, Petitioner had abandoned all of his tort claims, including the §§ 1981 and 1983 claims. The tax court therefore concluded that Petitioner's §§ 1981 and 1983 claims could not provide a basis for a § 104 exclusion because such claims did not exist at the time of settlement, as required by prong two of the § 104 analysis. Petitioner points to several places in the pretrial order as proof that, contrary to any ambiguous abandonment language in the pretrial order, his §§ 1981 and 1983 claims were pursued at trial and were in existence at the time of the parties' settlement in 1990.

We agree with Petitioner that the tax court erred in determining that Petitioner had abandoned his 42 U.S.C. §§ 1981 and 1983 actions. Both the "Points of Law" and the "Disputed Factual Issues" sections of the pretrial order indicated that issues related to §§ 1981 and 1983 causes of action were still being litigated. Therefore, Petitioner satisfied his burden regarding prong one, because he had litigated a claim sounding in tort, to wit, the §§ 1981 and 1983 claims. Similarly, Petitioner also satisfied prong number two because his §§ 1981 and 1983 claims existed at the time he settled his case with the CDOE, and the $464,000 amount he received was in settlement of those claims.

As to the third prong, we find that Petitioner's §§ 1981 and 1983 claims "potentially involved injuries that were personal." *Greer,* 207 F.3d at 328. As we have previously observed, §§ 1981 and 1983 claims can encompass such personal injuries as mental anguish, damage to character, or damage to a personal or professional reputation, *id.* (collecting cases), and these types of tangible and intangible harms were contemplated by § 104(a)(2) at the time that Petitioner's settlement agreement was executed. Petitioner specifically requested in his second amended complaint, among other forms of relief, general damages (for harassment, humiliation, and embarrassment suffered by Plaintiff), and future medical and hospital expenses. Any relief granted for these harms Plaintiff suffered could fairly be construed as compensating personal injuries within the meaning of § 104(a)(2). *See id.*

However, we find that Petitioner failed to meet his burden to show that the settlement agreement was executed "on account of personal injuries or sickness." *Greer,* 207 F.3d at 334 (quoting *Schleier,* 515 U.S. at 330) (internal quotation marks omitted). Our inquiry in this regard requires us to examine the settlement agreement's purpose and, absent a clear purpose, the payor's intent in settling the claims. *Greer,* 207 F.3d at 329 (citations omitted). A determination regarding a payor's intent requires us to "consider[] the amount paid, compar[e] the circumstances and amount paid to other agreements the company has entered into, consider[] the factual circumstances that led to the agreement, and weigh[] other facts that may reveal the employer's intent." *Greer,* 207 F.3d at 329 (citing *Pipitone,* 180 F.3d at 864-65).

In support of his contention that he satisfied the burdens set forth under the third and fourth prongs, Petitioner points to language in the settlement agreement, to wit, "[Petitioner] characterizes this payment of $464,000.00 as payment for personal injury damages suffered after [Petitioner's] discharge on July 14, 1986." (J.A. at 159.) The tax court rejected this language as self-serving and contradicted by other evidence

in the record. Petitioner argues that the tax court clearly erred in failing to give appropriate weight to the characterization in the settlement agreement.

We agree with Petitioner that language in a settlement agreement can offer some probative evidence of how a settlement payment should properly be characterized for purposes of § 104(a)(2). *See, e.g., Bent v. Comm'r,* 87 T.C. 236, 246 (1986), *aff'd,* 835 F.2d 67, 70 (3d Cir. 1987). However, in this case the settlement agreement did not attempt to assess the damages of the lawsuit and allocate Petitioner's recovery accordingly. *See Robinson v. Comm'r,* 102 T.C. 116, 128-29 (1994) (rejecting a settlement agreement's characterization of the settlement amount, which allocated 95% to mental anguish and 5% to lost profits, as "uncontested, nonadversarial, and entirely tax-motivated" and not accurately "reflect[ing] the realities of . . . [the parties'] settlement"). In the present case, Petitioner can point to no other evidence in the record that supports his characterization of the settlement payment. For instance, his second amended complaint sought general damages for future (presumably, anticipated) medical and hospital expenses, but at the time of settlement he offered no receipts or other information indicating that he had suffered medical expenses or intended to do so in the near future. Similarly, there is nothing in the record to reflect a numerical value Petitioner placed on his mental anguish. Indeed, the settlement agreement does not even indicate the CDOE's intent in paying the settlement amount; the agreement merely indicates that *Petitioner* characterizes the $464,000 payment as compensating him for personal injuries. The only intent on CDOE's part reflected in the record is its intent to dispose of the case in an expeditious manner and a willingness to acquiesce in Petitioner's tax-favorable characterization of the settlement proceeds. Petitioner's characterization of his own settlement payment, with no further support in the settlement agreement or elsewhere record, cannot control the issue.

Not only does Petitioner fail to point to any evidence in the record to support his characterization of the $464,000 settlement payment, the record contains several indicia tending to contradict Petitioner's characterization. In particular, the pretrial order pertaining to Petitioner's California federal court lawsuit stated that the only "[r]elief [s]ought" at trial was "reinstatement, back pay, and attorneys' fees." (J.A. at 147.) This would suggest that the claim, at least at the time of settlement, no longer encompassed personal injuries, and that the settlement agreement was executed on account of non-personal injuries, to wit, economic injuries. Moreover, testimony from Petitioner's lawyer, as well as a letter from Petitioner to an IRS agent, indicated that Petitioner offered to settle for $850,000, a figure he computed based on salary, which represents economic damages as opposed to personal injuries. Petitioner nevertheless agreed to the defendants' counteroffer of $464,000, so long as he could characterize the payment amount in the settlement agreement as covering personal injuries. Based on the evidence favoring the Commissioner, the tax court's finding on this point was not clearly erroneous, and we decline to overturn it.

We agree with the Commissioner that the 1990 settlement of Petitioner's California federal court action against the CDOE and other defendants for $464,000 does not fall under the § 104(a)(2) exclusion from income. Although some of Petitioner's claims, at the time of the settlement, were "based upon tort or tort type rights," *Schleier,* 515 U.S. at 337, Petitioner failed to meet his burden of showing that his §§ 1981 and 1983 claims were settled on account of his personal injuries. Specifically, Petitioner has not met his burden of establishing a causal connection between his $464,000 settlement payment and any personal injuries he may have suffered. Because the settlement amount could not be excluded under § 104(a)(2), it was properly included as income under 26 U.S.C. § 61(a). We therefore affirm the tax court's determination on this issue.

## B. Whether the Portion of Petitioner's Lawsuit Settlement Paid to His Attorney Under a Contingency Fee Arrangement was Excludable from Income.

Next, Petitioner argues that the tax court erred in holding that the $150,000 in contingency fees he paid to his attorney as part of the California federal court settlement was not excludable from his gross income. Petitioner specifically contends that the tax court's ruling in this regard contravened our precedent. The Commissioner argues that the tax court acknowledged our precedent but properly distinguished it based on differing facts. We agree with Petitioner and reverse the tax court's determination as to this issue.

There is a circuit split on the issue of whether contingency fees must be included in gross income.[7] The Commissioner has always taken the position that contingency fees must be included, based on the anticipatory assignment of income doctrine. This theory is most typically exemplified in two Supreme Court cases: *Lucas v. Earl,* 281 U.S. 111 (1930), and *Helvering v. Horst,* 311 U.S. 112 (1940). In *Lucas,* the taxpayer assigned one-half of his future salary to his wife to avoid paying taxes on the entire salary, and argued in litigation that because he had never actually received the income before distributing it to his wife, it was not income to him. The Supreme Court disagreed, reasoning that because the taxpayer had earned and created the right to receive and enjoy the benefit of the income before assigning it, he was

---

[7] The Fifth, Sixth, and Eleventh Circuits have held that contingency fees are excludable. *See Foster v. United States,* 249 F.3d 1275 (11th Cir. 2001); *Srivastava v. Comm'r,* 220 F.3d 353 (5th Cir. 2000); *Estate of Clarks v. United States,* 202 F.3d 854 (6th Cir. 2000). The Third, Fourth, Seventh, Ninth, Tenth, and Federal Circuits have taken the opposite view. *See Campbell v. Comm'r,* 274 F.3d 1312 (10th Cir. 2001); *Kenseth v. Comm'r,* 259 F.3d 881 (7th Cir. 2001); *Young v. Comm'r,* 240 F.3d 369 (4th Cir. 2001); *Benci-Woodward v. Comm'r,* 219 F.3d 941 (9th Cir. 2000); *Coady v. Comm'r,* 213 F.3d 1187 (9th Cir. 2000); *Baylin v. United States,* 43 F.3d 1451 (Fed. Cir. 1995); *O'Brien v. Comm'r,* 38 T.C. 707 (1962), *aff'd,* 319 F.2d 532 (3d Cir. 1963) (*per curiam*).

subject to taxation on the entire salary. 281 U.S. at 114-15. The Court further emphasized that the fundamental purpose of the tax code–to tax income to those who create, earn and enjoy it– "could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." *Id.* at 115. Thus, the Court declined to honor attempts to attribute fruits "to a different tree from that on which they grew" and held the entire salary, not just half, constituted taxable income to the taxpayer. *Id.*

Similarly, in *Horst,* the taxpayer owned negotiable bonds. Shortly before their maturity date, he removed the interest coupons from the bonds and gave them to his son, who subsequently collected interest on them. 311 U.S. at 114. During litigation, the taxpayer argued that the interest payments were not taxable to him because he never received the interest payments. Again, the Supreme Court disagreed. Observing that "[t]he dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid," it concluded that the tax established by the 1934 Revenue Act could not "fairly be interpreted as not applying to income derived from interest or compensation when he who is entitled to receive it makes use of his power to dispose of it in procuring satisfactions which he would otherwise procure only by the use of the money when received." *Id.* at 119 (alterations in original). Therefore, the Court reasoned, because the taxpayer had earned and created the right to receive and enjoy the benefit of the income by virtue of the fact that he owned the bonds and the interest generated therefrom was guaranteed to him when he transferred the coupons, the income could fairly be attributed to him for taxation purposes. *Id.* at 117-20. Again reasoning that "the fruit is not to be attributed to a different tree from that on which it grew," *id.* at 120 (citing *Lucas,* 281 U.S. 115), the Court held that the transferred coupons constituted taxable income to the taxpayer. *Id.*

Nevertheless, the first case to address the tax treatment of contingency fee arrangements declined to apply the assignment of income doctrine to contingency fee payments. In *Cotnam v. Commissioner,* 263 F.2d 119 (5th Cir. 1959), following a successful Alabama court lawsuit to enforce a contract, the taxpayer paid her legal counsel a portion of the judgment award, pursuant to a contingency fee arrangement between them. The Commissioner subsequently treated the taxpayer's entire judgment award, including the contingency fee portion, as taxable income and assessed tax deficiencies accordingly. The court held that the contingency fee portion of the judgment award was not income to the taxpayer. In concluding that the anticipatory assignment of income doctrine did not apply to the contingency fee the taxpayer paid to her legal counsel, the *Cotnam* court looked to Alabama's attorney's lien statute, which at the time provided that

> [u]pon suits, judgments, and decrees for money, [attorneys] shall have a lien superior to all liens but tax liens, and no person shall be at liberty to satisfy said suit, judgment or decree, until the lien or claim of the attorney for his fees is fully satisfied; and attorneys at law shall have the same right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them.

*Id.* at 125 n.5 (citing Ala. Code § 64 (1940)). In other words, the *Cotnam* court reasoned, the statute provided an attorney with an equitable lien that effectively transferred part of the taxpayer's claim to the attorney. The practical consequence of Alabama's attorney's lien law was that an attorney in Alabama held an equity interest in both the cause of action and the judgment, and the taxpayer, as the client, was precluded from ever realizing income on that percentage of the judgment representing the contingency fee.

The *Cotnam* court declined to apply the anticipatory assignment of income doctrine, noting that, unlike the

circumstances in *Lucas* and *Horst,* the attorneys' claim to payment lacked fair market value and that it was uncertain as to when or whether the attorneys' claim would attain value (given that contingency fees are only paid in the event of a successful outcome of the taxpayer's lawsuit). Indeed, the court noted, the claim was "worthless without the aid of skillful attorneys." *Id.* at 125. Therefore, the *Cotnam* court concluded, because (1) the contingency fee never passed through the taxpayer's hands or was controlled by the taxpayer, and (2) only the attorney's services resulted in converting the uncertain claim into an item of value, the taxpayer properly excluded the contingency fee portion of his judgment from his income. *Id.* at 127.

We adopted the *Cotnam* doctrine in *Estate of Clarks v. United States,* 202 F.3d 854 (6th Cir. 2000). In that case, the taxpayer received a jury award in a Michigan state court personal injury suit, and the attorney received one-third of the judgment award and interest as a contingency fee. The taxpayer soon thereafter died, and the estate, when filing the taxpayer's income tax return, properly included in gross income the interest portion of the judgment, but excluded the portion of the amount contingency fee attributable to interest. *Id.* at 855. In holding that the exclusion was proper, we rejected the Commissioner's position for reasons similar to those articulated in *Cotnam.* First, we pointed out that Michigan's attorney lien law operates in essentially the same way as the Alabama statutory lien examined in *Cotnam,* and essentially amounted to an assignment of a portion of the potential judgment. The record had indicated that the client originally owned the underlying claim but then relinquished his right to receive payment for the lawyer's contingency fee portion of any judgment upon signing the contingency fee contract.

Like the *Cotnam* court, we then proceeded to reject the anticipatory assignment of income doctrine as applied to contingency fees. In distinguishing the *Earl* and *Horst* decisions, we reasoned that a contingency fee, as part of a

litigation claim, was not already earned, vested, or even relatively certain to be paid to the assignor, but instead was merely "an intangible, contingent expectancy," dependent upon the attorney's skills to realize any value from it. *Id.* at 857. We then compared the contingency fee arrangement to a division of property:

> Here the client as assignor has transferred some of the trees in his orchard, not merely the fruit from the trees. The lawyer has become a tenant in common of the orchard owner and must cultivate and care for and harvest the fruit of the entire tract. Here the lawyer's income is the result of his own personal skill and judgment, not the skill or largess of a family member who wants to split his income to avoid taxation. The income should be charged to the one who earned it and received it, not . . . to one who neither received it nor earned it.

*Id.* at 858.

We then distinguished *Earl* and *Horst* on three additional grounds. First, unlike the true income assignments in *Earl* and *Horst,* no tax avoidance purpose motivated the contingency fee arrangement; rather a business purpose motivated it. *Id.* at 858. Second, unlike the *Earl* and *Horst* assignees who performed no services to earn their income, the attorney earned his income because the income resulted from his own skill and judgment. We also were motivated by the fact that applying the assignment of income doctrine to contingency fees would result in double taxation, whereas in *Earl* and *Horst,* the assignees could exclude what they received as gifts. *Id.* at 857, 858.

In the instant case, the tax court acknowledged the *Estate of Clarks* decision but distinguished it on the grounds that Petitioner's underlying lawsuit, from which his attorney's contingency fee was generated, took place in California. California's law on attorneys' contingency fees, unlike

Alabama's law, does not operate under a lien theory. Rather, California's lien statute confers no ownership interest on attorneys, and "[c]ontingent fee contracts 'do not operate to transfer a part of the cause of action to the attorney but only give him a lien upon his client's recovery.'" *Benci-Woodward,* 219 F.3d at 943 (citations omitted). Thus, in California an attorney who is entitled to a contingency fee "acquires no more than a professional interest,"*id.,* and is no different from an ordinary creditor who, if "stiffed" on his payment, would have to enforce the contract judicially. On appeal, Petitioner urges this Court not to draw distinctions based on the lien theory of the particular state in which an action arises. We agree with Petitioner.

We find persuasive the reasoning of the Fifth Circuit, which recently faced similar factual circumstances. In *Srivastava v. Comm'r,* 220 F.3d 353, 363-64 (5th Cir. 2000), the Commissioner argued that *Cotnam* was not controlling because the taxpayer's contingency fee agreement was controlled by Texas law, and Texas' attorney's lien statute did not provide attorneys with a superior claim lien against their clients' judgments or any ownership interests. The *Srivastava* court declined to distinguish *Cotnam* based on the differing state attorney's lien laws, instead determining that "the answer [as to whether to apply *Cotnam*] does not depend on the intricacies of an attorney's bundle of rights against the opposing party under the law of the governing state." *Id.* at 364. We likewise are not inclined to draw distinctions between contingency fees based on the attorney's lien law of the state in which the fee originated. Given the various distinctions among attorney's lien laws among the fifty states, such a "state-by-state" approach would not provide reliable precedent regarding our adherence to the *Cotnam* doctrine or provide sufficient notice to taxpayers as to our tax treatment of contingency-based attorneys fees paid from their respective jury awards. *Cf. O'Brien v. Comm'r,* 38 T.C. 707, 712 (1962), *aff'd,* 319 F.2d 532 (3d Cir. 1963) (*per curiam*) (rejecting distinctions in applying the *Cotnam* doctrine, based upon differing state attorney's lien laws because it doubted

"that the Internal Revenue Code was intended to turn upon such refinements").

More importantly, the reasoning in *Estate of Clarks* case seems to have been based on more than the nature of Michigan's lien law. To be sure, the similarity between Michigan's attorney's lien statute in *Estate of Clarks* and Alabama's attorney's lien statute in *Cotnam* played a role in the outcome. *Estate of Clarks,* 202 F.3d at 856. However, we found other factors persuasive in distinguishing contingency fees from *Lucas* and *Horst,* including the following: (1) the fact that the claim, at the time the contingency fee agreement was signed, was "an intangible, contingent expectancy," (2) taxpayer's claim was like a partnership or joint venture in which the taxpayer assigned away one-third in hope of recovering two-thirds; (3) no tax-avoidance purpose was at work with the contingency fee arrangement, as there ostensibly was in *Lucas* and *Horst*; and (4) double taxation would otherwise result by including the contingency fee in taxpayer's income. *Id.* at 857-58.

The *Estate of Clarks* holding does not primarily rest on the rationale that separate state lien laws governing attorneys' rights determine the correct characterization of an attorney contingency fee. We therefore hold that *Estate of Clarks* is controlling in the present case, notwithstanding the difference in Michigan's and California's respective attorney's lien laws. In so holding, we will follow our precedent without protracted inquiries into "the intricacies of an attorney's bundle of rights." *Srivastava,* 220 F.3d at 364. The nature of Petitioner's attorney's rights notwithstanding, the facts of this case are within the scope *Estate of Clarks* contemplated: By signing the contingency fee agreement, Petitioner transferred some of the trees from the orchard, rather than simply transferring some of the orchard's fruit. *Estate of Clarks,* 202 F.3d at 858.

We therefore hold that *Estate of Clarks* is not distinguishable based on the distinctions between California's

attorney's lien law and Michigan's lien law. Thus, consistent with our prior precedent in *Estate of Clarks,* we hold that the $150,000 Petitioner paid in contingency fees to his attorney is excludable from his gross income. Because the tax court erred in determining that the $150,000 was not excludable, we reverse the tax court as to this issue.

### C.  Whether the Tax Court Properly Denied Petitioner's 1990 Alimony Deduction Pursuant to the "Duty of Consistency" Doctrine.

Finally, Petitioner appeals the tax court's ruling regarding the deductibility of his alimony payments. At trial, Petitioner had sought to claim as a deduction for the 1990 tax year the $72,013.62 alimony payment he made to Verna Banks. He had argued that although he took the deduction in 1993 (when the California Superior Court had transferred the funds to Verna), because he had paid the funds into court in 1990 he should have taken the deduction then, pursuant to § 461(f) of the Internal Revenue Code, 26 U.S.C. § 461(f).[8] In denying Petitioner the deduction, the tax court had agreed with Petitioner that an alimony deduction would properly have been taken in 1990. However, the tax court continued, because the Commissioner was now precluded by the § 6501 statute of limitations from adjusting Petitioner's 1993 tax year, the duty of consistency doctrine prevented Petitioner from "taking one position on one tax return and a contrary position on another return for which the limitation period has run." 81 T.C.M. (CCH) 1219, 2001 Tax Ct. Memo LEXIS

---

[8]Section 461 provides a deduction for payment of alimony. Specifically, § 461(f) provides that where the alimony payment is a "contested liability," then a transfer of such contested funds is deductible if the following four criteria are met: (1) taxpayer contests an asserted liability, (2) he transfers money or other property to provide for the satisfaction of such liability, (3) the contested nature of the liability still exists after the transfer has been completed, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed in the taxable year of the transfer. 26 U.S.C. § 461(f).

68, at *29. On appeal, Petitioner asserts that this ruling was erroneous as a matter of law. Because the tax court failed to follow our precedent as to the "duty of consistency" rule, we reverse the tax court's ruling with respect to this issue and remand for further consideration.

The "'duty of consistency' rule prevents a taxpayer who has already had the advantage of a past misrepresentation–in a year now closed to review by the government–from changing his position and, by claiming he should have paid more tax before, avoiding the present tax." *Lewis v. Comm'r,* 18 F.3d 20, 26 (1st Cir. 1994) (citing *Beltzer v. United States,* 495 F.2d 211, 212-13 (8th Cir. 1974)). When this situation arises, "the Commissioner may act as if the previous representation, on which he relied, continued to be true, even if it is not. The taxpayer is estopped to assert the contrary." *Eagan v. United States,* 80 F.3d 13, 17 (1st Cir. 1996). The rule's purpose is to "preclude[] parties from 'playing fast and loose with the courts'" by taking a position in a given tax year, then taking a contrary position once the statute of limitations has run on that taxable year. *Estate of Ashman v. Comm'r,* 231 F.3d 541, 543 (9th Cir. 2000) (quoting *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990)).

The controlling case on this doctrine is *Crosley Corp. v. United States,* 229 F.2d 376 (6th Cir. 1956), which instructs that for the "duty of consistency" doctrine to apply,

the taxpayer by his conduct must knowingly make a representation or conceal a material fact which he intends or expects will be acted upon by taxing officials in determining his tax, and the true or concealed material facts are unknown to the taxing officials or they lack equal means of knowledge with the taxpayer, and act on his representation or concealment, and to retrace their steps on a different state of facts would cause loss of taxes to the Government. A material factor is the availability of the necessary facts to the parties involved.

*Id.* at 380-81. Additionally, "[e]stoppel is an affirmative defense and the burden of proof is on the person asserting it." *Id.* at 381 (citing *Helvering v. Brooklyn City R.R. Co.,* 72 F.2d 274, 275 (2d Cir. 1934)). In *Crosley,* the taxpayer had erroneously deducted certain expenses over one year, instead of capitalizing them over two years. He therefore filed a claim for refund with respect to the lost year. *Id.* at 378. The district court granted summary judgment in favor of the government based on the duty of consistency doctrine. We reversed, noting that "[t]here was no misrepresentation of any fact by the taxpayer," *id.* at 381, and that, "[u]nder the facts which were known to the Commissioner, or were readily available to him, it was a question of law whether the deduction was properly taken in 1939 or should have been treated as a capital expenditure. A mutual mistake of law on the part of the taxpayer and the Commissioner in treating it as a cost of manufacturing does not create an estoppel." *Id.* We therefore reversed the judgment and remanded for further proceedings. *Id.* [9]

The *Crosley* case controls the present matter and mandates a reversal of the tax court's finding on this issue. We note that the tax court made no finding that Petitioner engaged in a misrepresentation, as *Crosley* requires. Moreover, as Petitioner correctly asserts, his mistake in taking the alimony deduction in 1993 instead of 1990 was a mistake of law, not of fact. Finally, there is an open issue as to whether the Commissioner had the same facts on hand as did Petitioner when he took the § 461 deduction in 1993. The tax court

---

[9]Other circuits similarly have required that evidence of a misrepresentation be presented in order for the duty of consistency doctrine to apply. *See, e.g., Eagan,* 80 F.3d at 17 ("The duty of consistency arises when the following elements are present: '(1) a representation or report by the taxpayer; (2) on which the Commissioner has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner.'") (quoting *Herrington v. Comm'r,* 854 F.2d 755, 758 (5th Cir. 1988)).

made no findings as to these issues. Instead, it declared that because 1993 was a closed tax year and the circumstances satisfied all the elements of the "duty of consistency" rule, Petitioner was precluded from arguing the deductibility of the alimony payment as to the 1990 tax year. However, aside from noting that 1993 was a closed tax year, the court did not address the other elements of the "duty of consistency" rule as articulated in *Crosley,* most particularly our requirement that Petitioner seeks to make a contrary factual representation, as opposed to correcting an earlier erroneous interpretation of the law. Thus, it appears that the tax court was applying a standard other than the standard established by *Crosley.* Application of a rule contrary to our own is erroneous, because the tax court is bound to follow Sixth Circuit precedent. *See Golsen v. Comm'r,* 54 T.C. 742, 756-57 (1970), *aff'd,* 445 F.2d 985 (10th Cir. 1971). We therefore hold that the tax court must reconsider this issue in light of our precedent in *Crosley.*

The Commissioner invites us to affirm the tax court's denial of a § 461 deduction to Petitioner on the alternative ground that Petitioner failed to establish on the record that his $72,013 payment constituted alimony within the meaning of § 71(b). The Commissioner argues that Petitioner failed to meet the § 71 standard because the record indicates that Petitioner's payments were for Verna's divisible community property share of Petitioner's military retirement benefits, and that this really was "a non-deductible division of community property between the divorced spouses." (Commissioner's Br. at 45.) The Commissioner adds that the $72,013 represented security for satisfaction of the arrears on Verna's payments, but also attorney's fees, which are not deductible.

We decline the Commissioner's invitation. First of all, it does not appear that the Commissioner contested at the tax court trial the issue of whether Petitioner's $72,013 payment to his former spouse constituted alimony within the meaning of § 71. Moreover, although the tax court indicated that Petitioner should have taken the § 461 deduction in 1990 as

opposed to 1993, the tax court did not elaborate on the analysis, and in particular the tax court offered no detailed discussion as to whether the $72,013 payment constituted alimony within the meaning of § 71, as required by § 461. Therefore, while the Commissioner may be correct as to the proper characterization of the $72,013 payment, it is not clear on the present record whether the tax court made a specific factual finding as to whether Petitioner's $72,013 payment constituted § 71 alimony, or whether the court was assuming *arguendo* that the $72,013 payment constituted alimony for purposes of rejecting Petitioner's argument based on the "duty of consistency" doctrine. Further, it is not clear on this record whether such a finding was erroneous, if indeed the tax court made such a finding. We are not inclined, on this limited record, to determine the character of the $72,013 payment or the propriety of a § 461 deduction (notwithstanding the "duty of consistency" doctrine) in reviewing the tax court's ultimate resolution of the issue.

Because the tax court did not follow our precedent in *Crosley* in determining that the doctrine of consistency applies, we reverse the tax court's denial of the § 461 deduction Petitioner seeks. However, on remand, the tax court, if it deems appropriate, may revisit the issue of whether the $72,013 payment constituted alimony within the meaning of § 71. In making this determination, the court may consider any new evidence the Commissioner or Petitioner wishes to present on the issue.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the tax court's decision that Petitioner's California federal court suit settlement proceeds were not excludable from gross income under 26 U.S.C. § 104. However, we **REVERSE** the tax court's determination that the contingency fees Petitioner paid to his attorney constituted taxable income, and we **REVERSE** the tax court's ruling that Petitioner could not deduct his alimony payments for the 1990 taxable year based

on the "duty of consistency" doctrine. We **REMAND** this case to the tax court for further consideration consistent with this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Although I agree with much of the majority's thoughtful opinion, I write separately to express my disagreement regarding the contingency-fee issue.

As the majority holds, we are bound by our circuit's recent decision in *Estate of Clarks v. United States*, 202 F.3d 854 (6th Cir. 2000), which held that the lawyer's contingency fee operated as a lien on the client's recovery that under Michigan law transferred part of the ownership of the client's claim to the attorney, such that the client never realized income on the contingency-fee part of the judgment. We are dealing here, however, not with Michigan law but with California law regarding the characterization of the lawyer's contingency-fee interest in taxpayer Banks's employment-related claim. California's law has been authoritatively and persuasively construed by a panel of the Ninth Circuit in *Benci-Woodward v. Commissioner*, 219 F.3d 941 (9th Cir. 2000), which held that, "[u]nder California law, an attorney lien does not confer any ownership interest upon attorneys or grant attorneys any right and power over the suits, judgments, or decrees of their clients." *Id.* at 943 (relying on *Isrin v. Superior Court*, 403 P.2d 728, 732, 733 (Cal. 1965)). California law, as explained by the California Supreme Court and the Ninth Circuit, clearly treats the attorney's contingency-fee contract as simply a security interest and not as an ownership interest. Thus I would affirm the Tax Court's ruling here that the proceeds the taxpayer paid to his attorney as a contingency fee should be included in the taxpayer's income. *See also Srivastava v. Commissioner*, 220 F.3d 353, 367-69 (5th Cir. 2000) (Dennis, J., dissenting).

Regarding the issue of the deductibility of the taxpayer's payments to his ex-wife and the duty of consistency, I do not

disagree with the majority's assessment that the Tax Court did not appear to apply our half-century-old case, *Crosley Corp. v. United States*, 229 F.2d 376 (6th Cir. 1956), and that the Tax Court did not appear to make any relevant factual findings. Therefore I do not disagree with remanding this issue to the Tax Court for further proceedings. I note that this case seems to me to be one where the duty of consistency applies, because the taxpayer has unique knowledge regarding the nature and timing of his payments for his ex-wife, such that he should not be able to take one position on one tax return and a diametrically opposite position on another return on which the statute of limitations has run against the government. I suggest that in revisiting this issue, the Tax Court is free to determine whether there was a representation by the taxpayer as well as to evaluate the other requirements that comprise our version of the duty of consistency. I agree with the majority that on remand the Tax Court also may address the underlying question whether the payment even constituted § 71 alimony at all.

Finally, I concur fully in the majority's determinations that the taxpayer's characterization of the settlement proceeds as payment for personal injuries is worth no weight and that the Tax Court properly determined that no portion of the settlement amount was attributable to personal injuries.